**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X

MASSAPEQUA UNION FREE SCHOOL DISTRICT, MASSAPEQUA UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, KERRY WACHTER, *in her capacity as a Board of Education Member and a Resident/Parent of the School Community and on behalf of her minor child L.W.*, JEANINE CARAMORE, *in her capacity as a Board of Education Member and a Resident/Parent of the School Community and on behalf of her minor child M.C.*, SAVE THE CHIEFS FOUNDATION INC., and LAURA CHRISTOPHER, *on behalf of herself and her minor child H.C.*,

<div style="margin-left:3em">

Plaintiffs,

-against-

</div>

KATHY HOCHUL, in her capacity as Governor of the State of New York, NEW YORK STATE EDUCATION DEPARTMENT, BETTY A. ROSA, in her capacity as Commissioner of Education, the NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents,

<div style="margin-left:3em">

Defendants.

</div>

--------------------------------------------------------------------------

**VERIFIED COMPLAINT**

Index No. 25-5791

*Jury Trial Demanded*

**TABLE OF CONTENTS**

NATURE OF THE PROCEEDING ................................................................................ 1

JURISDICTION AND VENUE ................................................................................... 2

PARTIES ...................................................................................................................... 2

FACTS AND PROCEDURAL HISTORY .................................................................... 7

THE NATIVE AMERICAN LEGACY AND CULTURAL HERITAGE IN NEW YORK
STATE ......................................................................................................................... 7

    I.    New York's Indigenous History and Its Influence on Place Names and Public
Institutions.................................................................................................................. 7

    II.    The Massapequa "Chiefs" Name and Logo Are Derived From and Honor the Area's
Local Native American History ................................................................................. 7

PERTINENT REGULATORY HISTORY .................................................................. 13

    I.    New York State's "Anti-Bullying" Dignity for All Students Act Is Defendants' Tenuous
Basis For the Rule ................................................................................................... 13

    II.    The History of the Implementation of Part 123 of the Regulations of the Commissioner of
Education.................................................................................................................. 14

THE RULEMAKING................................................................................................. 16

THE RULE AND NYSED'S IMPERMISSIBLE POST HAC REVISIONS VIA
"GUIDANCE" ........................................................................................................... 17

    I.    The Rule's Broad and Unconstitutional Prohibitions. ...................................... 17

    II.    Part 123.3(b) Provides for Extensions to Delay Enforcement of Part 123 Against School
Districts—But NYSED Impermissibly Denied the District's Extension Request.................... 19

DEFENDANTS' VIOLATIONS................................................................................. 23

    I.    The Rule Violates Numerous Constitutional Provisions and Statutes............................ 23

    a. The United States Department of Education Has Found the Rule Violates Title VI and
Commenced Enforcement Actions Against NYSED For Promulgating The Rule And A
School District That Complied With The Rule ................................................................ 23

    b. The Rule Compels the District to Breach the Agreement with the Native American
Guardian's Association and to Violate Title VI................................................................ 30

    c. The Rule Compels the District to Violate Title VII.......................................................... 33

    d. The Rule Violates the First Amendment of the United States Constitution..................... 35

    II.    Part 123's Discriminatory Ban on Contracting With, and By, Native Americans,
Effectively Invalidates The District's and NAGA's Contractual Rights in Violation of
State Law.................................................................................................................. 48

    a.    Part 123 Compels the District to Discriminate Against Native American Tribes and
Individuals By Eliminating Their Right to Contract........................................................... 48

b.    Part 123 Unconstitutionally Compels the Plaintiffs to Discriminate Against and Terminate their MSD-NAGA Agreement with A Native American Group and Individuals.................................................................................................................. 50

DEFENDANTS DENIED THE PLAINTIFF DISTRICT'S "GOOD CAUSE" EXTENSION REQUEST UNDER PART 123.3(b), THEREBY COMPELLING THIS ACTION................... 51

I.    Defendants' Denial of the Plaintiff District's Request for Extension............................. 51

II.    Other School Districts Have Been Granted Extensions Under Part 123.3(b) Despite Not Satisfying the "Good Cause" Standard ...................................................................... 56

AS AND FOR A FIRST CAUSE OF ACTION BY ALL INDIVIDUAL PLAINTIFFS AGAINST ALL DEFENDANTS (Part 123 Is Impermissibly Overbroad in Violation of the First Amendment of the U.S. Constitution) ................................................................................ 61

AS AND FOR A SECOND CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS (Part 123 Violates Title VI of the Civil Rights Act of 1964)) ........................... 64

AS AND FOR A THIRD CAUSE OF ACTION BY THE DISTRICT AND CARAMORE AGAINST ALL DEFENDANTS (Part 123 Violates the First Amendment Rights of Incumbent and Non-Tribal Member Candidates) .......................................................................... 71

AS AND FOR A FOURTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS (Part 123 Violates 42 U.S.C. § 1981).................................... 74

AS AND FOR A FIFTH CAUSE OF ACTION BY THE DISTRICT AGAINST ALL DEFENDANTS (Part 123 Violates Title VII of the Civil Rights Act of 1964) .......................... 76

AS AND FOR A SIXTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS (Part 123 Violates the Dormant Commerce Clause)............................... 79

AS AND FOR A SEVENTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS (Part 123 Violates the Indian Commerce Clause).................. 83

PRAYER FOR RELIEF ................................................................................................. 85

Plaintiffs MASSAPEQUA UNION FREE SCHOOL DISTRICT, MASSAPEQUA UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, SAVE THE CHIEFS FOUNDATION, INC., KERRY WACHTER on behalf of herself in her personal capacity and Board Member capacity and on behalf of her minor child L.W., JEANINE CARAMORE on behalf of herself in her personal capacity and Board Member capacity and on behalf of her minor child M.C., and LAURA CHRISTOPHER on behalf of herself and her minor child H.C., (collectively, the "Plaintiffs"),  by and through their attorneys, state and allege the following against KATHY HOCHUL, in her capacity as Governor of the State of New York ("Governor"), the NEW YORK STATE EDUCATION DEPARTMENT ("NYSED"), BETTY A. ROSA, in her capacity as Commissioner of Education (the "Commissioner"), the NEW YORK STATE BOARD OF REGENTS ("Board of Regents"), and LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents (collectively, the "Defendants"):

## NATURE OF THE PROCEEDING

1.     This is a declaratory judgment action seeking to annul *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (hereinafter "Part 123" or the "Rule") and enjoin its enforcement.

2.     The declaratory judgment action presents a facial and as-applied challenge to the constitutionality of Part 123 under the First Amendment of the U.S. Constitution; under the Commerce Clause pursuant to Article I, Section 8 of the United States Constitution (both Dormant and Indian Commerce Clauses); for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and for violations of 42 U.S.C. § 1981. Plaintiffs seek declaratory and injunctive relief on the grounds that Part 123 is unconstitutional and discriminatory. Defendants should be enjoined from

enforcing it.

3.      The United States Department of Education ("USDOE") has: (i) after conducting an investigation, concluded on May 30, 2025, that Defendants violated Title VI of the Civil Rights Act of 1964 ("Title VI") by promulgating and enforcing Part 123, and (ii) opened a still-pending investigation into Connetquot Central School District (another Long Island School District) to determine if that school district violated Title VI by complying with Part 123.

4.      Plaintiffs requested that Defendants extend Plaintiffs' June 30, 2025 deadline to comply with the Rule due to, among other legal bases including a valid contract with the Native American Guardian's Association (the "NAGA"), the USDOE's determination that the Rule and its enforcement violate Title VI.

5.      On June 20, 2025, Defendants denied that extension request, putting Plaintiffs in an untenable legal position between state and federal law.  Absent judicial relief, Plaintiffs have two choices: (i) violate the Rule and subject itself to Defendants' immediate enforcement, or (ii) comply with the Rule in violation of the First Amendment, Title VI, Title VII, the Dormant Commerce Clause, the Indian Commerce Clause, and 42 U.S.C. § 1981, thereby subjecting Plaintiffs to immediate enforcement by the federal government and additional legal liability.

6.      Plaintiffs seek immediate judicial relief.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 3613.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff Massapequa Union Free School District (the "District") is a K-12 public

2

school district located in Massapequa, New York that currently serves approximately 6,564 students in nine schools. District administrative offices are located at 4925 Merrick Road, Massapequa New York 11758.

10.    The District is subject to the Rule as it is required to change its school name, logo, and mascot from the "Chiefs" to a non-Indigenous name despite "Chiefs" having been the District's name, logo and mascot for decades in honor of the Massapequa community's rich Native American history.

11.    Plaintiff Massapequa Union Free School District Board of Education ("Massapequa Board") is the duly elected governing body of the District. The Massapequa Board is comprised of five residents of the community who serve three-year terms as representatives in all matters concerning the school district.

12.    Plaintiff Kerry Wachter is the President of the Board of Education, a resident of the Massapequa School District, and a parent of a current District student. She is a named Plaintiff here and sues Defendants in her personal capacity, in her Board member capacity, and on behalf of her minor child, L.W. Wachter brings claims on behalf of herself and her minor child.

13.    Petitioner Jeanine Caramore is Vice President of the Board of Education, a resident of the Massapequa School District, and a parent of a current District student.  She is a named Petitioner here and sues Respondents in her personal capacity, in her Board member capacity, and on behalf of her minor child, M.C. Caramore brings claims on behalf of herself and her minor child.

14.    Plaintiff Save The Chiefs Foundation, Inc. (the "Foundation") is a New York not-for-profit charitable corporation organized under Section 402 of the Not-for-Profit Corporation Law. The Foundation was incorporated on June 2, 2025, and is organized for charitable and

3

educational purposes under Section 501(c)(3) of the Internal Revenue Code.

15.     The Foundation's purposes—as stated in its Certificate of Incorporation filed with the New York Department of State (Filing No. 250602002412)—include: preserve Massapequa's cultural and community heritage; advocate for the retention of the "Chiefs" name and mascot used by Massapequa, New York, school district as a means of honoring the region's Indigenous and local history, fostering civic pride, and maintaining cultural continuity; promote public education and awareness; provide educational programs, lectures, publications, and community outreach initiatives designed to increase public understanding of the cultural, historical, and educational significance of Indigenous representation in school and community symbols; facilitate community dialogue; organize forums, events, and initiatives that promote respectful, informed, and inclusive discussions involving Native American communities, educators, alumni, students, and residents of Massapequa and the surrounding area; preserve historical records and materials; collect, archive, and disseminate materials related to the history and legacy of the "Chiefs" name and mascot, including but not limited to oral histories, photographs, publications, and memorabilia, for public educational use; and, within the bounds permitted by Section 501(c)(3), engage in community-based advocacy for the preservation of the "Chiefs" name and mascot.

16.     The Foundation has members and supporters throughout Massapequa. Its programs and events depend on the ability to celebrate and teach about Native American heritage in the school environment, including through the respectful use of the "Chiefs" name and logo. The initial directors of the Foundation include Tara Tarasi, Robert Bascetta, and Gabrielle DiNello.

17.     The Foundation's membership includes an individual of Native American heritage. In particular, Shannon Tarasi is an active member of the Foundation and of Native American heritage. She has participated in past fundraising and community-education efforts and intends to

4

continue doing so. The State's elimination of the Chiefs name and logo harms Ms. Tarasi and similarly situated members by erasing Native American representation in the school community the Foundation serves, and the Foundation brings this action in part to protect their interests. Ms. Tarasi also has a child enrolled in the District, and Part 123 discriminates against her heritage and her child by only eliminating Native American names, logos, and imagery in federally funded school programs, while allowing all other races and ethnicities to be represented.

18.    Part 123 directly undermines the Foundation's mission and charitable purposes by forcing the removal in the District of the very cultural representations the Foundation was created to preserve. If Part 123 is enforced against the Massapequa School District, the Foundation's ability to educate, advocate, and conduct cultural programming will be severely curtailed and impeded.

19.    The Foundations' members have been denied equal treatment, equal educational opportunity, and the ability to participate in community decision-making on equal terms with others.

20.    As a result of Part 123 and the State's threatened enforcement, the Foundation has also had to divert significant organizational resources to urgent advocacy, legal consultation, and public education efforts designed to preserve the Chiefs name and logo. These diversions have forced the Foundation to allocate time to litigation instead of planned cultural education events, reduce outreach to schools outside Massapequa, and expend funds that otherwise would have been used for education and public programs. The Foundation's members are suffering imminent and irreparable harm because the Chiefs name and logo will be eliminated absent court intervention.

21.    For example, as a result of Part 123, the Foundation organized a "Save the Chief Day" on June 7, 2025, and scheduled additional fundraising events for September 28, 2025 and

5

late October. These reactive initiatives—necessitated solely by Part 123—have displaced and delayed the Foundation's intended Native American educational programming and materially impaired their ability to advance the Foundation's charitable mission.

22.    Plaintiff Laura Christopher is a resident of Massapequa, New York, and has been a taxpayer in the Massapequa Union Free School District since 2017. She is the parent of a child, H.C., currently enrolled in the Massapequa School District, specifically at Birch Lane Elementary School. Her child is in fourth grade, aged nine, and is a minor. She also has another child, aged 18, who graduated from Massapequa High School in June 2025. Christopher brings claims on behalf of herself and her minor child.

23.    Christopher and H.C. are Native Americans, specifically members of the Cherokee tribe.

24.    Defendant Kathy Hochul is the Governor of the State of New York and head of the Executive Branch under which NYSED falls.  She is sued in her official capacity as Governor.

25.    Defendant New York State Education Department (the "NYSED") is an agency of the State of New York and the administrative arm of the University of the State of New York ("USNY"), which consists of all public and private elementary and secondary schools in the state; all privately and publicly controlled institutions of higher education; and all libraries, museums, and other educational and cultural institutions admitted to or incorporated by USNY.

26.    Defendant New York State Board of Regents ("Board of Regents") sets education policy for the State of New York and oversees both the USNY and NYSED.

27.    Defendant Betty A. Rosa is the Commissioner of NYSED and President of USNY. She is sued in her official capacity.

28.    Defendant Lester W. Young, Jr. ("Chancellor Young") is the duly appointed

Chancellor of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

## FACTS AND PROCEDURAL HISTORY

### THE NATIVE AMERICAN LEGACY AND CULTURAL HERITAGE IN NEW YORK STATE

I.   **New York's Indigenous History and Its Influence on Place Names and Public Institutions**

29.   Long Island's rich history originates from the Native American tribes who live, and once lived, in the area. These historical roots live on in the names of municipalities, school districts, public parks, bodies of water, and various historical landmarks, which are derived from the names of local tribes, famous Native Americans, and Algonquin phrases.

30.   Several Long Island tribal names inspired the names of municipalities throughout Long Island, including the Rockaways, Merrick, Massapequa, Setauket, Shinnecock, Montauk, Amagansett, and Manhasset.

31.   These Native American historical roots extend far beyond Long Island. In fact, the names of counties all across State of New York originate from Native American tribes, people, and phrases. For instance, Allegany County, Cayuga County, Chautauqua County, Chemung County, Oneida County, Onondaga County, Oswego County, Otsego County, Saratoga County, Seneca County are derived from Native American names.

32.   There are also various bodies of water named after Native American tribes or phrases including the Ashokan Reservoir, Seneca Lake, Cayuga Lake, and Lake Ronkonkoma.

II.   **The Massapequa "Chiefs" Name and Logo Are Derived From and Honor the Area's Local Native American History**

33.   Massapequa is a hamlet of Nassau County located in the Town of Oyster Bay.

7

Massapequa Park is an incorporated village located within the Town of Oyster Bay. Collectively, Massapequa and Massapequa Park are known as the Massapequas.

34.    The District is located in Massapequa and serves both Massapequa and Massapequa Park.

35.    The Massapequas' name and history—like many other municipalities throughout the State of New York—are derived from Native American roots. The name Massapequa is derived from the Native American term "Marspeag" or "Mashpeag," which translates to "great waterland."

36.    The area now known as Massapequa was occupied by Native American tribes for thousands of years. Before the European settlement of Long Island, it was occupied by one of the 13 Tribes of Long Island, which was an Algonquin-speaking group called the Lenape.

37.    The settlement of Massapequa occurred in 1658 when a group of Quaker settlers, who had previously settled in America and formed a farming community in Oyster Bay, purchased the land from the local tribe, which at the time was led by their chief, Sachem Tackapausha.  At the time, Sachem Tackapausha led one of the 13 tribes of Long Island known as the Massapeaques.

38.    Sachem Tackapausha was a Lenape, or Chief, who was instrumental in forming an alliance with sachems from other Native American tribes to represent the Algonquian-speaking people during negotiations with the Dutch settlers.  He is known as one of the most powerful Algonquian leaders on Long Island.

39.    The Quaker settlers had friendly dealings with Sachem Tackapausha after purchasing the land. Every year, Sachem Tackapausha would return to Massapequa to accept a tribute, which was typically a new coat, among other goods. When Sachem Tackapausha died, the settlers continued to pay tribute to his brother.

40.    To this day, the Massapequa community continues to pay homage to Sachem

Tackapausha.  His memory has lived on, not just in the District's name and logo, but throughout Massapequa as a whole.

41.    In 1925, the Massapequa Avenue School opened its doors with five classrooms, five teachers, and 100 students. This school served grades K-8 only, and it was the first school built in Massapequa.  The District, like the municipality it serves, uses the name "Massapequa" to honor its Native American roots. The "Chiefs" logo was created around this time and could be found on student's gym apparel.

42.    Massapequa High School opened its doors in September 1955 and has continued to use the "Chiefs" name and logo ever since.

43.    Below is an image of the District's logo and "Chiefs" name and logo, which is an image depicting Sachem Tackapausha himself.

 

44.    The Massapequa High School has no mascot outside of its logo. In other words, there is no Chiefs costume.

45.    The Incorporated Village of Massapequa Park was founded in 1931. The Village seal, as depicted below, also includes an image of Sachem Tackapausha, as well as his name:

9



46.     This same image can be found on a sign welcoming visitors and residents to Massapequa Park, located in downtown Massapequa Park, as depicted below, as well as on a plaque located in front of Village Hall.



47.     Sachem Tackapausha's image can also be found on a sign placed by the local Chamber of Commerce welcoming visitors and residents to Massapequa, as depicted below:



48.     Sachem Tackapausha's image is also displayed on the building of the Massapequa Fire Department, on every fire truck, and on the sleeve of every volunteer firefighter:

10



49.     Images of Sachem Tackapausha are also displayed in murals and other street art located throughout the community.

50.     Notably, even the wall of the New York State Department of Motor Vehicles office in Massapequa displays a mural of Long Island designating Massapequa with a gold star and an image of a Native American man in an Indian headdress, demonstrating that the State honors Massapequa's Native American history too.



51.    At school and community functions, Massapequa residents wear "Chiefs" apparel, which is not only sold in the Massapequa High School Chiefs Apparel Store, but also in other privately-owned businesses around town. And the phrase "Once a Chief, always a Chief" can be heard throughout the schools and community at large.

52.    As various adult and student Massapequa residents explained in a video prepared by the District entitled "MSD: Once a Chief, Always a Chief," the "Chiefs" name is not just a school sports logo; rather, it is a mindset that honors Native American heritage and unifies the Massapequa community by encouraging it to strive for excellence. This video is available at https://www.youtube.com/watch?v=iOTBTo1xvzc.

53.    The District created the video and posted it publicly on YouTube in June 2023 in direct response, and as a form of protest to, Part 123.

54.    A "Chief" is defined as the leader of a group or body of people.   The name is used in various contexts, and usually symbolizes a form of leadership.  Examples include a Chief Judge, Chief of Police, Fire Chief, and the United States of America's Commander-in-Chief.

55.    The word "Chief" is consistent with the District's vision and mission statement, which is leadership-driven. As indicated on the District's website, it strives to create "leaders one child at a time."  The District's mission and vision statement can be found on the "About Our District" page of the District's website, which is available at https://www.msd.k12.ny.us/page/about-our-district.

56.    The District envisions a learning community comprised of Massapequa leaders (and learners) who exhibit certain qualities, one of which is to be a "goal directed, resilient, and courageous leader."  When students and members of the school community (including Plaintiffs Caramore, Wachter, Christopher, and their children) put on their Chiefs apparel, they are not just

showing support for their sports teams. They are identifying themselves as a Massapequa Chief, someone who embodies the core principles inherent in the District's mission and vision statement.

57.    As the Board explained in an April 18, 2023 letter to the Massapequa community:

> The Chief is more than a symbol to Massapequa—it celebrates the rich history of our town and honors Chief Tackapausha, who, according to local history sources, sold the area now known as Massapequa Park to a group of settlers in 1658. To understand our local history, all one needs to do is look around our community. From our very name of Massapequa to the many historical plaques located throughout town, we pay our respects to 365 years of history.

58.    The "Chiefs" logo is—and has always been—about honor and respect. It is meant to honor the area's Native American roots, and particularly, to honor the great Sachem Tackapausha, who has a direct and strong connection to the area.

### PERTINENT REGULATORY HISTORY

I.    **New York State's "Anti-Bullying" Dignity for All Students Act Is Defendants' Tenuous Basis For the Rule**

59.    In September 2010, the New York State Legislature enacted the Dignity for All Students Act (hereinafter "DASA") which took effect in July 2012. New York's Education Law was amended to create a new Article 2 entitled "Dignity for All Students."

60.    DASA prohibits bullying, harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class. *See* N.Y. Educ. Law § 12.

61.    The legislation was designed to prevent incidents of discrimination or harassment, including bullying, taunting, or intimidation, through the institution of preventive, educational measures.  *See* N.Y. Educ. Law § 10; *see also* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

62.    As reflected in the legislative history of the act, the State Legislature felt it was

important to create state-wide anti-bullying legislation to combat bullying and harassment in schools. The Bill Jacket for DASA provides, "Although school yard bullies have long had a presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students – and particularly those who are targeted by such bullies – an educational environment in which they can thrive." *See* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

63. This sentiment was reiterated in a Senator's July 16, 2010 letter to then-Governor Patterson (which is also part of the Bill Jacket): "[t]he implementation of DASA will provide clear direction to school districts and reduce the incidents of harassment and discrimination which are now an epidemic in our schools."

64. The DASA is the statutory basis upon which NYSED promulgated Part 123, which is the regulation being challenged in this action.

## II. The History of the Implementation of Part 123 of the Regulations of the Commissioner of Education.

65. NYSED promulgated Part 123 with an effective date of May 3, 2023.

66. However, the policy underlying Part 123 had a long, unsuccessful history prior to Part 123's enactment.

67. Decades prior, in April 2001, then-Commissioner of Education Richard Mills released a memorandum to all public school districts in the State of New York outlining his position on public schools' use of Native American names, symbols, and mascots and asking boards of education to end the use of Native American mascots.

68. NYSED, at the time, did not issue any Commissioner's regulations or mandatory guidelines after the Commissioner of Education released his April 2001 memorandum.

69. While a bill seeking to amend the Education Law to prohibit public schools from

14

using Native names, logos, or mascots was presented to the State Assembly during its 2021-2022 Legislative Session, it was referred to the Assembly Committee on Education and remained there for review.[1] That failed bill proposed to "[r]equire[] the Commissioner of education to promulgate rules and regulations to ensure that no public school uses a native name, logo or mascot."

70.     Another failed bill in that same 2021-2022 session was introduced "[p]rohibit[ing] public schools from using a native name, logo or mascot."[2] A similar bill was introduced in the 2023-2024 session.[3]

71.     There were three separate bills introduced in two successive Legislative sessions without any successful enactments by either the Assembly or Senate.

72.     These failed bills demonstrate that the legislative and democratic will did not support a ban on Native American names, imagery, or logos in public school—yet Defendants still pushed ahead, exceeded its authority, and enacted the Rule through regulatory fiat.

73.     To this day, the State Legislature has never enacted a law banning Indigenous names, logos, and mascots in public schools.

74.     On November 17, 2022—twenty-one years after the April 2001 memorandum—Senior Deputy Commissioner for Education Policy James Baldwin issued a memorandum in which he unilaterally declared with no due process that public school districts were prohibited from using Native American mascots and threatened removal of school officers and withholding of State aid if school districts did not affirmatively commit to replacing their Native American team name, logo, and/or imagery by the end of the 2022-2023 school year.

75.     This November 2022 memorandum referenced regulations that were being

---

[1] Assembly Bill No. 5443 in the 2021-22 session.
[2] Senate Bill No. 1549 in the 2021-22 session.
[3] *See* Senate Bill No. 4052 introduced in the 2023-24 session.

15

developed by NYSED, couching them as regulations that would clarify school districts' obligations.

76. Deputy Commissioner Baldwin made this across-the-board directive to all public school districts *before* Part 123 was even drafted, much less subjected to a 60-day public comment period or actually promulgated in accordance with the SAPA, which is the statutory scheme outlining the mandatory process for administrative agencies to promulgate rules and regulations.

77. Neither Deputy Commissioner Baldwin, nor the Commissioner of Education herself, has the authority to adopt an across-the-board directive without first formally adopting a regulation or rule to that effect and only has power to do so with delegated authority from the legislature.

## **THE RULEMAKING**

78. On December 28, 2022, Part 123 was published as a proposed rule for public comment in the New York State Register.

79. Before such publication, on December 1, 2022, the Board of Regents indicated they anticipated the proposed amended Part 123 regulation would be presented for permanent adoption at the April 2023 Regents meeting, and become effective as a permanent rule on May 3, 2023, after publication of the proposed amendment in the State Register and expiration of the 60-day public comment period required under SAPA. *See* Ex. A.

80. Accordingly, even prior to the public comment period, NYSED made it clear it planned to adopt Part 123 before the public comment period even began. Even worse, the November 2022 memorandum made clear that NYSED planned to adopt Part 123 before it even finished preparing a draft of it.

81. In other words, NYSED's failed compliance with SAPA was mere window

16

dressing, as NYSED went through the motions toward a pre-ordained result.

82.    This is further evidenced in NYSED's "Assessment of Public Comment," which was released in April 2023. There, NYSED acknowledged it provided school districts with advance notice of its intentions in Mr. Baldwin's November 2022 memorandum. Again, NYSED declared its intentions to enact a regulation that was still in the works and had not undergone the requisite "notice-and-comment" requirements of SAPA.

83.    On April 18, 2023, the Board of Regents voted to adopt Part 123.

84.    On May 3, 2023, NYSED published the Notice of Adoption of Part 123 with an effective date as of that date.

### THE RULE AND NYSED'S IMPERMISSIBLE POST HAC REVISIONS VIA "GUIDANCE"

**I.    The Rule's Broad and Unconstitutional Prohibitions.**

85.    Part 123 states that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction," except as provided in section Part 123.4. (8 NYCRR 123.2.).

86.    Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school sports teams." (8 NYCRR 123.1.) This definition excludes a public school, school building, or school district named after an Indigenous tribe.

87.    Part 123 provides limited exceptions to this rule. First, a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation is not prohibited from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal

17

members, including a tribal school or intramural league. (8 NYCRR 123.4(a).)

88.     Second, Part 123 does not apply "where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe." (8 NYCRR 123.4(b).)

89.     Under this provision of Part 123, NYSED only acknowledges written agreements submitted before May 3, 2023, and therefore rejects any written agreements submitted after that date. Part 123 does not provide for any extensions of this arbitrary deadline.

90.     Furthermore, under Part 123.4(b), "[a] public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement." And "[t]he tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot."

91.     Part 123 also requires public schools to "prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." (8 NYCRR 123.5.) However, "[t]his provision shall not apply to any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation."

92.     Part 123 required boards of education to commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 school year. (8 NYCRR 123.3(a).) And it required those resolutions to identify a plan to eliminate all use of the

18

prohibited name, logo, or mascot by the end of the 2024-2025 school year.

93.      Part 123 allows the commissioner to grant an extension of these timelines "[u]pon a showing of good cause." (8 NYCRR 123.3(b).)

94.      Because NYSED will not provide any funding to support its mandate, school districts are forced to fund these changes themselves.

95.      Part 123 sets a June 30, 2023 deadline for boards of education to first self-determine if their names, logos, or mascots even fall within the scope of Part 123 and, if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

96.      Here, in order to comply with the June 30, 2023, deadline imposed by Part 123, the Districts' Board of Education passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year. The resolution makes clear, however, that the Board of Education's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge (a) whether the use of the "Chiefs" name does in fact constitute a prohibited "Indigenous name, logo or mascot" pursuant to Part 123, and (b) whether Part 123 should be repealed and/or determined to be unenforceable by the Commissioner and/or any court of competent jurisdiction.

97.      This forced resolution was passed by the Board of Education on June 22, 2023. The District filed a pending federal court action in 2023 and this action thereafter.

**II.      Part 123.3(b) Provides for Extensions to Delay Enforcement of Part 123 Against School Districts—But NYSED Impermissibly Denied the District's Extension Request.**

98.      Part 123.3(b) provides that the commissioner may grant an extension "[u]pon a showing of good cause."

99.      Part 123 does not define "good cause."

19

100.    Part 123 does not include any accompanying criteria or context for interpreting or evaluating "good cause."

101.    In May 2023, NYSED issued the *Background and Frequently Asked Questions Regarding Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools.*[4] *See* Ex. B (the "FAQ").

102.    NYSED issued the FAQ[5] document after the Rule was promulgated and the public comment period closed. *See* Ex. B.

103.    "Good cause" is not defined in the FAQ document.

104.    Instead of defining "good cause," the FAQ document introduces a separate standard—"good faith compliance"—which appears nowhere in Part 123 itself.

105.    The section of the FAQ document addressing Part 123.3(b) extension requests states:

> **Q: What if my district is unable to fully eliminate team names, mascots, or logos with connections to Indigenous Nations or peoples by the end of the 2024-2025 school year?**
>
> A: Upon a showing of ***good cause***, the commissioner may grant an extension of the timelines prescribed in this regulation. The approval or denial of an extension shall be in writing and, if applicable, NYSED shall state the reasons for the denial.
>
> ***Good faith compliance*** may include:
>
> > • The inability of specific staff members, contractors, or consultants to complete specific work on a timely basis if significant progress (approximately 75%) has been made and is ongoing;
> > • Replacement costs that could be substantially mitigated if postponed for a brief period; and

---

[4] https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf
[5] https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf

> • In the case of capital projects needed to comply with this regulation, work toward compliance will have commenced, and a substantial percentage of the work needed to comply (approximately 75%) shall have been completed by the end of the 2024-2025 academic year with an attestation by the district, consultant, or contractor to such effect provided. These capital projects are not considered new facilities.

(*FAQ*, p. 10.) (emphasis added).

106. While the FAQ initially reiterates that a "showing of good cause" is sufficient, it then introduces a narrower and distinct concept—"good faith compliance"—as a new framework for evaluating extension requests. (*FAQ*, p. 10.)

107. Critically, however, this newly introduced standard has no foundation in the actual text of Part 123 or the Education Law.

108. The actual text of Part 123 does not condition extensions on a showing of "good faith compliance"—nor does it even reference that term.

109. The inclusion of this "good faith compliance" language in the FAQ document—an informal, nonbinding guidance document—constitutes a substantive departure from the Rule's plain language.

110. Further, the FAQ's use of the term "may" reinforces that the listed examples of "good faith compliance" are illustrative, non-exhaustive, and not mandatory.

111. If NYSED had intended to limit extensions strictly to those listed scenarios (e.g., 75% progress), it would have employed definitive language such as "must" or "only if."

112. Accordingly, a school district may satisfy none, one, or all of the listed examples and still demonstrate "good faith compliance."

113. More fundamentally, however, the FAQ document cannot supplant the "good cause" standard set forth in the regulation's text without a supplemental notice and comment period amending the Rule pursuant to SAPA.

21

114.    The only applicable criterion under Part 123.3(b) is a showing of "good cause."

115.    The insertion of "good faith compliance" as a *de facto* prerequisite for an extension lacks any basis in the regulatory text and is therefore legally unenforceable. Any attempt to apply that standard in lieu of the regulation's plain language is procedurally improper and invalid.

116.    NYSED's "Assessment of Public Comment"[6] on Part 123 further confirms that "good cause" is the sole and operative standard for granting an extension under Part 123.3(b). *See* Ex. C, pp. 9-22 ("Assessment of Public Comment").

117.    The "Assessment of Public Comment" acknowledges that extensions may be necessary for districts seeking additional time to implement changes, such as relocating or contextualizing historical materials. In response to a separate inquiry from a school district asking whether it would be prohibited from displaying legacy items like "photographs, trophies, [or] banners" with retired logos and whether additional time could be granted to implement necessary changes, NYSED responded:

> DEPARTMENT RESPONSE: The Department does not recommend the destruction or alteration of historical artifacts such as photographs, trophies, or banners. The intent of this regulation is not to pretend that Indigenous mascots were never used but to eliminate their use going forward. Harmful as they may be, the use of indigenous mascots, like the forced relocation of Native American tribes, is a historical fact that must be acknowledged (*see generally McGirt v. Oklahoma*, 591 US --- [2020]).
>
> **With respect to extensions of time**, the regulation permits school districts to request an extension of the deadlines identified in the regulation based **"[u]pon a showing of good cause"** (8 NYCRR 123.3 [b]). Therefore, **school districts that require additional time may utilize this process**. No changes to the proposed rule are necessary

(Assessment of Public Comment, pp. 13-14) (emphasis added).

118.    This response, published as part of the official rulemaking record, makes no mention of "good faith compliance," "75% progress," or any other limiting criteria. It stands in

---

[6] https://www.regents.nysed.gov/sites/regents/files/423brca4.pdf

stark contrast to the subsequently issued FAQ document, which introduced those concepts for the first time—outside the formal rulemaking process and without citation to any underlying legal authority.

119. NYSED's regulatory position in the official record is clear: extensions are available upon a showing of "good cause" alone.

120. If NYSED intended to condition extensions under Part 123.3(b) on "good faith compliance" or any other specific standard, it was required to include that condition through the formal rulemaking process—either in the text of the regulation itself or in its published responses to public comment. Its failure to do so makes clear that the "good faith compliance" standard is a post hoc creation, in violation of SAPA, unsupported by law and lacking the procedural legitimacy to override the regulation's plain language.

## DEFENDANTS' VIOLATIONS

**I.    The Rule Violates Numerous Constitutional Provisions and Statutes**

**a.    The United States Department of Education Has Found the Rule Violates Title VI and Commenced Enforcement Actions Against NYSED For Promulgating The Rule And A School District That Complied With The Rule**

121. Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

122. On May 30, 2025, the U.S. Department of Education determined that the "New York Department of Education and the Board of Regents" violated Title VI by[7]:

---

[7] Press Release, U.S. Dep't of Educ., *Secretary McMahon Visits Massapequa High School, Announces Finding in School Mascot Probe* (May 30, 2025),

23

Implement[ing] a statewide prohibition on names, mascots, or logos based on Native American race and national origin, but allowed names, mascots, and logos that appear to have been derived from other racial or ethnic groups, such as the "Dutchmen" and the "Huguenots." Accordingly, OCR determined that the Board's policy was discriminatory, and therefore violating Title VI.

123.    Federal laws such as Title VI preempt state law based on "conflict preemption" where, *inter alia*, "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 95 (2d Cir. 2012).

124.    Based on the U.S. Department of Education's conclusion, Part 123 is preempted by Title VI because compliance with both Part 123 and Title VI is impossible.

125.    Following this Title VI finding, the U.S. Department of Education "issued a proposed Resolution Agreement to the New York Department of Education and the New York State Board of Regents to voluntarily resolve the Title VI violations . . . within 10 days or risk possible referral to the U.S. Department of Justice (DOJ) for enforcement proceedings and potential loss of federal funding."

126.    The U.S. Department of Education outlined the following requirements:

- Rescinding the part of the educational regulation prohibiting the use of Indigenous names, mascots, and logos by New York public schools;
- Issuing a memorandum to all Local Education Agencies informing them that they may adopt a name, mascot, and logo consistent with the requirements of Title VI; and
- Issuing letters of apology to Indigenous tribes, acknowledging that the Board violated Title VI by discriminating against Native Americans and, through its implementation of the statewide policy, silenced the voices of Native Americans and attempted to erase Native American history.

127.    Defendants failed to remedy the Title VI violation, and on June 17, 2025, the U.S.

---

https://www.ed.gov/about/news/press-release/secretary-mcmahon-visits-massapequa-high-school-announces-finding-school-mascot-probe.

Department of Education formally referred the case against the New York State Department of Education and the New York State Board of Regents to the U.S. Department of Justice "for their unlawful attempt to ban mascots and logos that celebrate Native American history."[8]

128.    The U.S. Department of Education stated that Defendants plainly rejected the foregoing proposed resolution "that would bring both entities into compliance with Title VI of the Civil Rights Act (1964) by rescinding its prohibition on Native American mascots and logos."[9]

129.    As a result, any enforcement or application of Part 123 by the Plaintiffs would now constitute a Title VI violation—subjecting them to substantial legal exposure and compelling them to infringe upon the constitutional rights of others.

130.    Shortly after that Title VI conclusion, the U.S. Department of Education announced a Title VI investigation into the Connetquot Central School District, a Long Island public school district and former co-plaintiff in a litigation against NYSED, because "the Connetquot Central School District—which had vigorously opposed Part 123 in litigation and public statements, citing constitutional violations—has now reversed course and is actively taking steps to erase its Native American mascot and imagery to comply with a state regulation that violates federal civil rights law."[10]

131.    If the Plaintiffs are now similarly compelled to enforce Part 123, they too face the prospect of irreparable harm, including imminent exposure to federal investigation and civil rights

---

[8] Press Release, U.S. Dep't of Ed., U.S. Department of Education Refers Massapequa Mascot Case to the U.S. Department of Justice (Jun. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-refers-massapequa-mascot-case-us-department-of-justice.
[9] *Id.*
[10] Press Release, U.S. Dep't of Ed., U.S. Department of Education Launches Title VI Investigation into Connetquot Central School District Over Native American Logo Ban (Jul. 8, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-title-vi-investigation-connetquot-central-school-district-over-native-american-logo-ban.

enforcement, as well as the compelled violation of others' constitutional rights. (*Id.*, ¶ 37.). Indeed, District accepts federal funds.

132.    And for the Plaintiffs, compliance with Part 123 means discriminating against the NAGA and violating the MSD-NAGA Agreement, discussed *infra*, solely based on the NAGA's status as Native Americans.  This is a clear Title VI violation and causes irreparable harm.

133.    After this determination, the U.S. Department of Education launched a Title VI investigation into Connetquot Central School District for actions taken to comply with Part 123.[11]

134.    In doing so, the U.S. Department of Education expressly stated:

> Despite OCR's finding last month that the New York Department of Education and Board of Regents policy prohibiting Native American mascots violates Title VI, the Connetquot Central School District—which had vigorously opposed Part 123 in litigation and public statements, citing constitutional violations—has now reversed course and is actively taking steps to erase its Native American mascot and imagery to comply with a state regulation that violates federal civil rights law.[12]

135.    School districts that now comply with Part 123 face harm in the form of costly federal investigation and potential loss of funding.

136.    In fact, the potential harm is certain and imminent. Plaintiff Christopher and her minor child, H.C., are Native American members of the District. Should the District enforce Part 123, it would be violating Title VI and causing immediate harm to H.C., a beneficiary of Title VI and its protections.

137.    H.C. is a member of the Cherokee tribe and proudly wears Massapequa Chiefs apparel on spirit wear days, casual Fridays, to school, and throughout the community. She does so

---

[11] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Launches Title VI Investigation into Connetquot Central School District Over Native American Logo Ban* (July 8, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-title-vi-investigation-connetquot-central-school-district-over-native-american-logo-ban.
[12] *Id.*

as a visible expression of her cultural pride and Native American identity.  By wearing this apparel, H.C. affirms her heritage and ensures that her peers, teachers, and the broader school community recognize and respect her identity as a Native American student.

138.    H.C. also believes that the Chiefs name and logo reflect community spirit, school pride, and respect for Native American culture. It is also an expression of her identity and beliefs as a Native American.  She frequently shares her Native American identity with her friends and teachers, both inside and outside of school, as part of her effort to celebrate and educate others about her culture and background.

139.    H.C. and Christopher believe the Chiefs name and logo help promote Native American representation and respect in their schools, sports teams, and community. This representation is important for H.C., for other Native American students, and for all students in the District.  It provides an opportunity to teach about Native American history and heritage and fosters pride in Native American identity.

140.    The regulation eliminates positive representations of Native Americans from schools and targets, in a discriminatory manner, Native American names and logos for removal while permitting names and logos based on other racial, ethnic, and cultural identities to remain.

141.    This means that Native American representation is entirely removed from nearly every aspect of school life, including interscholastic sports teams, athletic uniforms, school buildings, athletic fields, gymnasiums, hallways, school apparel, signage, newsletters, promotional materials, and other symbols of school identity and pride. Under Part 123, H.C.'s identity and representation will be erased from all of these programs and school locations.

142.    And by targeting only Native American names and logos for elimination, the State has purposefully discriminated against Native Americans, including H.C., in violation of Title VI,

27

which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. The Massapequa School District receives federal funding.

143. Part 123 directly discriminates against H.C. on the basis of race and national origin by excluding her Native American heritage and representation from school programs and activities. Because of Part 123, H.C. cannot participate in interscholastic sports, assemblies, or other school activities under the same cultural representation as other students whose heritages are permitted to be represented in schools and team names, imagery, and logos. This unequal treatment marks H.C. as an outsider based solely on her Native American identity, which is a form of racial discrimination prohibited by Title VI.

144. H.C. and Christopher can no longer proudly express who they are as Native Americans in their own community and school. Massapequa was founded on Native American land, and generations of Indigenous people have lived, worked, and died there. Yet today, as one of the Indigenous families remaining in Massapequa, Christopher and H.C. are being stripped of their ability to be represented in the school and community.

145. The elimination of the "Chiefs" name and logo sends a message that Native American identity is something to be hidden or erased, rather than respected and embraced.

146. H.C. can no longer wear her Chiefs sweatshirt to school as a proud expression of her heritage—since that same Chiefs name and logo is being stripped from her District and its programs under Part 123. She is being denied the ability to authentically express who she is—a young Native American girl proud of her Cherokee roots. This erasure is not symbolic; it is deeply personal and emotionally harmful.

147. This harm extends beyond H.C. as well. It is detrimental to every child and family

in Massapequa who believes in inclusivity, pride, and cultural representation. Street names, landmarks, and community identity all bear witness to their Native American roots, yet the State's policy forces Plaintiffs to pretend they no longer matter.

148. Part 123 causes stigmatic harm by conveying that Native American imagery and heritage are uniquely unwelcome, inappropriate, or offensive. This stigmatizing message denies H.C. of the benefit of full and equal participation in school life by subjecting her to a message of exclusion that no other racial or ethnic group receives.

149. H.C. is also denied the benefit of a culturally relevant education and school environment that affirms her Native American identity if the Chiefs representation is eliminated through State action. Education does not occur only within the four walls of a classroom or solely through "classroom instruction." Education touches every aspect of what children, and my child H.C., do at school—attend school assemblies, extracurricular programs, athletics, and the symbolic environment of the school itself. Sports in particular are a major part of school life, community pride, and student development. By eliminating Native American representation from these settings, Part 123 deprives my child of the ability to see her heritage reflected in the school environment, which hurts the overall educational experience. The removal of this representation strips away an important opportunity for students, like H.C., to have pride in their school and in the diversity of cultures represented there, diminishing inclusivity, diversity, and belonging for Native American students.

150. This leaves the Plaintiffs in an untenable position: comply with Part 123, violate the rights of H.C. and Christopher, and risk immediate federal investigation and legal liability, or defy Part 123 and face removal of duly elected board members and the loss of State funding.

29

**b.    The Rule Compels the District to Breach the Agreement with the Native American Guardian's Association and to Violate Title VI**

151.    On May 15, 2025, Plaintiffs entered into a legally binding, written agreement (the "MSD-NAGA Agreement") with the Native American Guardian's Association and the Board of Directors of the Native American Guardian's Association (collectively, "NAGA").

152.    As stated in the MSD-NAGA Agreement, the "NAGA is a tax-exempt, non-profit organization pursuant to 26 U.S.C. § 501(c)(3), and a Native advocacy group recognized by the Bureau of Indian Affairs, United States Department of the Interior, advocating for increased education about Native Americans and Indigenous peoples, especially in public educational institutions, and greater recognition of Native American and Indigenous Heritage through high profile venues of sports and other public platforms, pursuant to which NAGA supports the respectful use of Native American and Indigenous names and imagery in sports, education, and public life[.]"

153.    As stated in the MSD-NAGA Agreement, the "NAGA is a collective of American Indian enrolled members and tribal descendants who support the artistry of native identifiers in sports and the mainstream[.]"

154.    As stated in the MSD-NAGA Agreement, "the Board of Directors of NAGA is comprised of, and represents, members of federally recognized tribal nations and Indigenous groups[.]"

155.    As stated in the MSD-NAGA Agreement, the "NAGA and the Board of Directors of NAGA permit, consent to, support, and authorize the District's continued use of the Indigenous names, imagery, and logos, as such symbols are culturally affiliated with NAGA, the Board of Directors of NAGA, and NAGA's component American Indian enrolled members and tribal descendants[.]"

30

156.    The MSD-NAGA Agreement defines NIL as "name, image, and likeness" (hereinafter "NIL").

157.    As stated in the MSD-NAGA Agreement, "the parties wish to memorialize these terms and conditions pursuant to which NAGA and the Board of Directors of NAGA permit, consent to, support, and authorize the District's continued use of the Indigenous NIL representations[.]"

158.    As stated in the MSD-NAGA Agreement, Plaintiffs and NAGA agreed to exchange the following consideration and things of value:

> So long as the District continues its current educational programming and instruction concerning Native American history and culture as outlined in the attached Exhibit "A" and the obligations outlined in this Agreement, NAGA and the Board of Directors of NAGA fully permit, consent to, support, and authorize the District in its continued use of the District's Indigenous NIL for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed. The District shall meet with a NAGA representative, either in person or remotely, at least once per year to review and discuss the educational programming and instruction. In exchange for NAGA's and the Board of Directors' permission, consent, support, and authorization of the District's use of the Indigenous NIL, the District also commits that it will continue to use the "Chiefs" name and logo as the District's official name and logo for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed. In the event that the District discontinues all the educational programing outlined in the attached Exhibit "A" or fails to continue using the "Chiefs" name, mascot, and logo, NAGA's and the Board of Directors' permission, consent, support, and authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn by operation of this Agreement.  In such an event, NAGA and the Board of Directors of NAGA will have no cause of action of any kind and nature to compel or require the District to provide any kind of educational programing or instruction.

159.    As stated in the MSD-NAGA Agreement, "Each Party acknowledges that the promises and covenants exchanged under this Agreement constitute good, valid, and sufficient

Consideration, the receipt and adequacy of which are hereby acknowledged. Each Party also acknowledges that the promises and covenants exchanged under this Agreement constitute good, valid, and sufficient Things of Value, the receipt and adequacy of which are hereby acknowledged. Capitalized terms 'Consideration' and 'Thing of Value' shall have the meanings ascribed to them under New York law, including as defined in 8 NYCRR § 123.4(b)."

160. As stated in the MSD-NAGA Agreement, "This Agreement is made and entered into in the State of New York and will be interpreted, enforced, and governed by the laws and regulations of the State of New York and applicable federal laws and regulations, except for the State of New York's choice of law provisions, regardless of the present or future residence and/or domicile of any of the parties."

161. The MSD-NAGA Agreement is an agreement entered into by all parties knowingly and voluntarily, and under no coercion or duress of any kind, and is a valid agreement under New York law.

162. To satisfy their contractual obligations under the MSD-NAGA Agreement, the Plaintiffs *must continue* to use the Chiefs name and logo. Meanwhile, Part 123 forces the Plaintiffs to terminate the use of the Chiefs name and logo, solely on the basis that the NAGA's name, image, and likeness are affiliated with Indigenous names, logos, and imagery.

163. Part 123 also forces the Plaintiffs to terminate and violate their contractual obligations to the NAGA solely based on the fact that the NAGA is comprised of Indigenous and tribal persons and groups.

164. Indeed, Plaintiffs are free to contract with any other individual or group of any race, national origin, color, or ethnic background on the same subject matter. Part 123 solely targets and excludes Indigenous and tribal members from entering into agreements with Plaintiffs and other

school districts.

165.    If Plaintiffs are compelled to comply with Part 123, they will incur significant harm, including (a) the substantial costs of replacing the "Chiefs" name and logo; (b) the erosion of community identity and tradition; and (c) legal exposure for breaching their contractual obligations under the MSD-NAGA Agreement and for discriminating in violation of state and federal law.

166.    As applied here, Part 123 is unconstitutional because it forces the Plaintiffs to discriminate against the NAGA in violation of Title VI. Part 123 is constitutionally preempted by federal law.

167.    Violation of the MSD-NAGA Agreement would also lead to the elimination of the "Chiefs" name and logo from the District under Part 123, which in turn harms all Plaintiffs.

### c.    The Rule Compels the District to Violate Title VII

168.    Part 123 facially violates Title VII because it directs school districts to discriminate against certain Indigenous people with respect to the terms, conditions, and privileges of their employment because of their race and national origin.

169.    Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

170.    Title VII applies to state, local, and federal governments with at least 15 employees. *Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 4 (2018) ("The 1972 amendment to Title VII thereby extended the statute's coverage to state and local government entities by defining them as 'person[s].' In turn, as 'person[s],' these entities meet Title VII's definition of 'employer' and are subject to liability only if they have at least 15 employees.")

171. The District is a local government employer with at least 15 employees and is thus subject to Title VII.

172. Defendants are also a state employer with at least 15 employees and are thus subject to Title VII.

173. Part 123.5 requires public schools to prohibit school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school functions.

174. Part 123.5 provides an exception for "any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation."

175. Although the regulation includes an exception for employees and officers who are *members* of a tribal nation, it flatly prohibits all other Indigenous employees and officers—including those with Indigenous cultural, familial, or ancestral ties—from engaging in the same expression. In doing so, Part 123 discriminates against Indigenous employees and officers based on their race and national origin.

176. This discriminatory restriction directly affects the terms, conditions, and privileges of employment for a subset of Indigenous individuals on the basis of their race and national origin. It creates a discriminatory requirement based on their tribal affiliation.

177. No other racial, cultural, or national origin group is subject to a comparable term or condition on the expression of their own culture or identity in the workplace.

178. The District employs numerous staff whose race and national origin it does not—and cannot reasonably—ascertain without impermissibly probing into protected classifications. Under Part 123's blanket ban, the Plaintiff District must treat every employee as if they might be

34

non-tribal unless that individual affirmatively demonstrates membership in a tribal nation—a status the District has no reliable, non-invasive way to verify.

179. To comply with Part 123, the Plaintiff District would have to single out and restrict the protected expression of any Indigenous employee not proven to be a tribal member—effectively disciplining or censoring Indigenous staff while allowing non-Indigenous employees free expression.

180. The Rule compels the District to violate Title VI.

181. Alternatively, if the Plaintiff District permits all employees to use or promote the "Chiefs" name and logo, it risks sanctions under Part 123.

182. Part 123 inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability from Title VII claims from misidentified and mistargeted employees. Under Part 123, the Plaintiff District would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

### d. The Rule Violates the First Amendment of the United States Constitution

183. The First Amendment of the United States Constitution provides "Congress shall make no law . . . abridging the freedom of speech".

184. Part 123 impermissibly restrains and abridges speech in at least three independent ways and requires the District to enforce a constitutional proscription.

185. *First*, Part 123.5 is a content- and viewpoint-based prohibition. Section 123.5 bars all school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school functions, except when the speaker is a *member of a tribal nation* and is promoting that tribe's imagery.

186. Under Part 123, school officers and employees—including incumbent board members, like Caramore and Wachter—are prohibited from "utilizing or promoting any Indigenous name, logo, or mascot" while on school property or at school functions, unless they are members of a tribal nation. This restriction applies even when the Indigenous name or logo is historically associated with the school and is a core part of the board member-candidate's political campaign message and identity.

187. This restriction prevents incumbent school board members (who are not members of tribal nations)—like Plaintiffs Wachter and Caramore—from engaging in protected political expression during campaigns, including wearing apparel (e.g., jackets, hats, pins, or team gear) bearing the school's Indigenous name or logo during school events such as football games, which are traditional campaign forums in local elections.

188. Part 123 does not apply to school board candidates who are not current district employees, officers, or board members. Nor does it apply to board members, officers, or employees who are members of a tribal nation. These candidates may freely attend the same school functions wearing Indigenous-branded apparel of their school or distributing campaign materials bearing Indigenous names and logos to advance their campaign messaging. This creates a content-based, speaker-based, and viewpoint-based asymmetry in school board elections.

189. This asymmetrical restriction operates to chill the protected speech of incumbent candidates and candidates who are school employees and officers (who are not members of tribal nations). As in *Davis v. FEC*, 554 U.S. 724 (2008), where the Supreme Court struck down a statute that gave preferential fundraising rights to non-self-financing candidates, the Defendants here impose a structural burden on First Amendment rights, giving non-incumbent candidates, non-district-employed candidates, and tribal nation member candidates a constitutionally

36

impermissible advantage.

190.   For example, if a school board candidate forum were held on school property in Massapequa School District, only the incumbents would be forced to remove "Chiefs" apparel, while challenging candidates (not employed by the District) and tribal nation candidates would be free to use and promote the "Chiefs" name and logo to advance their political and campaign messaging.

191.   By suppressing one class of speakers (incumbents and district-employed candidates) based on their status and content of their message (supporting the continued use of Indigenous names/logos), the regulation is not narrowly tailored to any compelling governmental interest.

192.   Specifically, it prohibits District officials and employees, like Plaintiffs Caramore and Wachter as Board Members, from engaging in expressive conduct through wearing Chiefs apparel, regardless of whether they are acting as a citizen and a member of the public.

193.   In particular, Plaintiff Caramore is an incumbent member of the Massapequa Board of Education and intends to seek re-election during the next eligible election cycle. She is not a member of a tribal nation and is subject to Part 123's prohibition on "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at a school function.

194.   In connection with her campaign, Plaintiff Caramore plans to engage in expressive and speech conduct by wearing apparel bearing the "Chiefs" name and logo—representing the school's historical identity—and by distributing campaign materials featuring the same.

195.   She also plans to use slogans like "Once a Chief, Always a Chief." She intends to do so at school-sponsored events and on school property, including football games, concerts, ceremonies, and other public functions that serve as traditional forums for candidate engagement

and voter outreach.

196. Part 123 prohibits her from engaging in this protected expression solely because of her status as a school officer and non-tribal member, thereby infringing her rights and putting her at a distinct disadvantage during her campaign.

197. Part 123 forces the District to discriminate against and violate the constitutional rights of incumbent school board members (who are not members of tribal nations), like Plaintiff Caramore.

198. *Second*, Part 123 is a prior restraint through mandatory elimination of a category of speech. By mandating elimination of the "Chiefs" name and logo from uniforms, facilities, websites, and instructional materials, the regulation constitutes a classic prior restraint on future speech and symbolic expression.

199. *Third*, the Defendants retaliated against the District and Board by denying their extension request. Defendants cited the District's "Save the Chief!" rally and litigation activities— clear demonstrations of expression and speech—as evidence of non-compliance when denying the Part 123.3(b) extension.

200. Defendants cannot satisfy the applicable strict scrutiny standard here.

201. First, they have identified no compelling governmental interest: respectful, tribally endorsed use of the "Chiefs" name and imagery causes none of the harms they speculate, and any genuine anti-harassment concern can be remedied through case-specific enforcement of DASA.

202. Second, the regulation is neither narrowly drawn nor internally consistent; it is simultaneously over-inclusive and under-inclusive, exempting pre-May 3 2023 agreements and tribal-member speech while singling out the District, and it grants lenient extensions to Wantagh and Connetquot yet withholds the same relief from Massapequa.

203. Third, obvious, less-restrictive alternatives were available—targeted discipline for proven misconduct, voluntary educational programming, or an opt-in rebranding process—all of which would advance the State's stated objectives without imposing a sweeping prior restraint on protected speech.

204. Part 123 does more than silence the District itself; it affirmatively commands the Board and the District to violate the speech and rights of their employees by prohibiting them from displaying the "Chiefs" name and imagery and by conditioning State aid and the continued tenure of school officers on the enforcement of that ban.

205. Plaintiffs Caramore, Wachter, and other District employees and officials engage in protected expressive activity when they wear their Chiefs apparel on school property for the purpose of attending school functions, including sports games, concerts, and other events as parents and members/residents of the school community.

206. When Plaintiffs Caramore, Wachter, and other District employees and officials wear their Chiefs apparel, they engage in expressive activity that intends to convey a particularized message.

207. When Plaintiffs Caramore, Wachter, and other District employees and officials wear their Chiefs apparel, they engage in activity as citizens or members of the public on matters of public concern.

208. Plaintiff Caramore is not only the Vice President of the Board of Education, but she is also a life-long resident of Massapequa who attended the District from K through 12th grade.

209. During her tenure as a high school student in the District, Plaintiff Caramore was Captain of the High School Varsity Volleyball team, president of student government, and intimately involved in various other extracurriculars, school functions, and community volunteer

39

efforts.

210.    To Plaintiff Caramore, a Massapequa Chief is a leader; she affiliates the name with pride and respect. As a student, Plaintiff Caramore tried to embody a Massapequa Chief by taking on various leadership roles during her high school career.

211.    Plaintiff Caramore is also a parent within the school community. Before graduating in 2022, her daughter played sports for the District.  Her son currently plays tennis for the District's high school and is expected to play sports for the District's high school until graduating from there. Prior to playing for high school sports teams, Plaintiff Caramore's son played soccer for the District's middle school.

212.    In addition to attending her own children's sports games, Plaintiff Caramore attends other school games, including but not limited to, homecoming, football games, and various playoffs. She also attends track meets for special education students.

213.    School sports are a popular pastime in Massapequa. The majority of the community attends school games while sporting their Chiefs apparel.

214.    Chiefs apparel also correlates with fundraising efforts. For example, members of the school community, including Plaintiff Caramore, will wear pink Chiefs apparel when fundraising for breast cancer, and they will often wear Chiefs apparel with an American flag to recognize 9/11.

215.    Wearing specialty apparel intended to show that the school community is united in supporting such fundraising efforts constitutes expressive activity warranting First Amendment protection.

216.    Plaintiff Caramore, like other District officials and employees, considers herself to be a lifelong Massapequa Chief. She wears her Chiefs apparel to support not only student athletes,

40

but the school and town community as a whole.

217.    As parents, Plaintiff Caramore and her husband wear their Chiefs apparel while attending their son's school games and other school functions.

218.    When Plaintiff Caramore, and other District officials or employees, attend school sports games and other functions wearing clothing and accessories that bear the Chiefs team name and logo, they intend to convey a particularized message: that they identify as members of, and associate with, the Massapequa Chiefs (not the opposing team), that they support their school athletes, and that they embody the core principles that their school team name represents.

219.    When Plaintiff Caramore, Wachter, and other District officials and employees wear their school apparel, they represent a symbol that signifies their group and viewpoint association.

220.    Team names, logos, and/or mascots are a common symbol of group or viewpoint association; indeed, mascots are a cherished tradition in sports that are intended to facilitate a sense of pride and unity among the team and fans.

221.    When Massapequa Chiefs wear their apparel, they send a message of solidarity and support for their community and the symbol that represents this community, which would be readily understood by those viewing it—particularly when school sports are a popular pastime in the community where the bleachers are filled with students, parents, and faculty members wearing Chiefs apparel in solidarity.

222.    Since Part 123 went into effect in 2023, Plaintiffs Caramore, Wachter, and other District officials and employees have worn Chiefs apparel for another reason: to protest Part 123 and fight for their First Amendment right to express themselves as members of the Chiefs community.

223.    As Massapequa parents, long-time residents, and American citizens, Plaintiffs

41

Caramore and Wachter fundamentally believe they have a constitutional right to wear Chiefs apparel even though Defendants (through the implementation of Part 123) have prohibited them from doing so.

224. Plaintiffs Caramore, Wachter, and other District officials and employees continue to wear their Chiefs apparel to support the District's ongoing fight to maintain the Chiefs name and logo. This type of expressive activity hits at the very core of their state constitutionally protected speech.

225. By wearing their Chiefs apparel for this purpose, Plaintiff Caramore, Wachter, and other District officials and employees have engaged in, and continue to engage in, protected activity in protest of Defendants' implementation and enforcement of Part 123, which itself restricts their fundamental rights to freedom of expression.

226. When Plaintiffs Caramore and Wachter wears her Chiefs apparel to protest Part 123 and to support the District's ongoing fight to keep its team name and logo, they undoubtedly engage in expressive activity on a matter of public concern.

227. When Plaintiffs Caramore, Wachter and other District officials and employees wear their Chiefs apparel to protest Part 123 and support the District's ongoing fight to keep its team name and logo, they undoubtedly engage in expressive activity on a matter of public concern.

228. Their speech involves matters of political, social, and other concerns to the community, and are the subject of legitimate news interests of value and concern to the public.

229. The issues in this case are not only matters of public concern within the Massapequa school community, they have become matters of nationwide interest involving not only school mascots but professional sports teams.

230. Various news media outlets have reported on the matter, including the New York

42

Times, CNN, Fox News, NBC, ABC7, News 12, Newsday, Newsweek, The Hill, The Morning Call, The New York Post, The Long Island Press, The Massapequa Herald, and many other outlets. Even before garnering national attention, it was a matter of public concern throughout the State of New York.

231. After Defendants announced their intent to implement Part 123, various news media outlets wrote about the regulation, with most of the articles calling out the District by name as one of the school districts implicated by the regulation.

232. The fact that Part 123 is an unfunded mandate for which noncompliance threatens the removal of school officials and state funding also makes it a matter of public concern. District officials and employees have a state constitutional right to wear their Chiefs apparel in any context. There is no compelling government interest to prohibit such expressive conduct.

233. In fact, Commissioner Mills's letter from 2001[13], which set off the movement that led to Part 123, stated, "School mascots are intended to make a statement about what the the (sic) school values."

234. Commissioner Mills further stated, "The use of Native American names, symbols, and mascots is such a significant issue that it is being looked at in other states, in professional sports, at the collegiate level, as well as at the local level in some New York school districts."

235. Commissioner Mills continued, "Our review confirmed that the use of Native American symbols is part of time-honored traditions in some of our communities, and that there are deeply felt, albeit conflicting, ideas about them." And this issue has led to "extensive statewide discussion of this issue."

---

[13] Richard P. Mills, *Public Schools Use of Native American Names, Symbols, and Mascots*, N.Y. State Educ. Dep't (Apr. 5, 2001), https://www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf.

236.    As exemplified by Commissioner Mills's comments, this issue is significant and implicates time-honored, statewide matters of public concern.

237.    The Foundation has also had its speech suppressed. Part 123 prohibits expression that celebrates or references Native American identity—such as the "Chiefs" name, imagery, and related educational materials—precisely because of the subject matter and viewpoint of that expression.

238.    This selective prohibition silences the Foundation's message in school settings: it is prevented from using the Chiefs name, logo, and educational materials that reference the "Chiefs" or depict Native American heritage in connection with school programs, facilities, events, or communications. The policy has chilled and continues to chill the Foundation's and its members' speech, forcing them to self-censor and refrain from distributing materials, signage, and presentations that convey their viewpoint in support of Native American representation in school settings.

239.    Because the restriction turns on the content of the message (Native American identity) and disfavors a particular viewpoint (support for continuing Indigenous representation), it uniquely burdens the Foundation's—and member Ms. Tarasi's—protected expression and denies their members the ability to participate in school symbolism and related discourse on equal terms with others. The suppression of their message is not narrowly tailored and was unnecessary given less-restrictive alternatives (e.g., case-by-case review of context, standards addressing misuse), further underscoring the constitutional infirmity.

240.    Part 123 also violates the speech rights of H.C. and Christopher.

241.    The State's actions violate Christopher's constitutional rights and H.C.'s constitutional rights, including their rights to free speech and expression, by preventing them and

44

other Native Americans in the community from expressing their Native American identity through the use of the Chiefs name and logo in the District's sports programs, educational programs, school buildings, and school apparel. Other racial and ethnic groups are permitted to be represented in school names and logos, but Native American representation and expression are being uniquely and unlawfully excluded and silenced.  For example, schools in New York continue to use names such as "Dutchmen" and "Huguenots," which are tied to European cultural and ethnic identities.

242.    The State's actions are based on impermissible considerations of race and national origin, because Part 123 expressly targets "Indigenous" names, logos, and mascots for elimination. It is purposeful discrimination.

243.    The State's policy also punishes the exercise of constitutional rights by preventing the District, parents, and students from expressing Native American identity through the Chiefs name and logo. This action chills protected speech and inhibits Christopher and H.C. from participating and expressing themselves fully and equally in the District and its programs.

244.    Part 123 is discriminatory. The effect and purpose of Part 123 are to single out and eliminate Native American representation from public schools, which is itself an act of discrimination.

245.    The State is aware that many Native Americans, including Christopher, H.C., and organizations such as the NAGA, strongly support respectful use of Native American names and imagery as a means of cultural education and pride. The State chose to ignore these voices and impose a blanket ban, demonstrating a purposeful decision to silence Native American perspectives that differ from its preferred policy.

246.    The State's decision to ban only Indigenous names and imagery, while allowing other racial and ethnic groups' names and imagery to remain, cannot be explained as neutral or

45

merely "anti-discriminatory." If the State's true intent were to remove all potentially offensive or culturally derived mascots, it would have applied Part 123 to all racial, ethnic, or cultural mascots equally or otherwise ban derogatory names/logos/mascots, not those honoring Native American culture.

247. The State's claim that Part 123 is intended to prevent discrimination ignores the reality that its enforcement has created a school environment where Native Americans alone are denied the right to see their culture represented, while other groups' names and symbols remain untouched. Part 123 does not advance a safe and supportive learning environment for every child because it categorically excludes one ethnic and racial group: Native Americans.

248. Part 123 directly affects programs and activities funded by federal dollars, including interscholastic sports teams, extracurricular programs, school communications, and school-sponsored events. The removal of Native American representation from those programs is a condition imposed by the State that impacts how those federally funded programs operate, and this directly harms H.C., who is a beneficiary of these programs.

249. The use of the Chiefs name and logo does not have a negative effect on Native Americans, including Christopher and her children, nor does it lead to stereotyping or prejudice among non-Native persons. To the contrary, the elimination of Native American representation— compelled by Part 123—is what causes actual harm. It erases cultural visibility, silences Indigenous voices, and promotes the false notion that Native American identity is inherently offensive or inappropriate for public recognition. This exclusion is far more damaging than the respectful use of names and symbols that honor Native heritage.

250. Because of Part 123, Christopher and her children will no longer be able to see the Chiefs name and logo displayed on their sports uniforms, school buildings, or school materials.

This erasure will cause H.C. to lose their visible source of pride and connection to their Native American heritage every day they attend school.

251. Christopher's children, including H.C., have worn Chiefs apparel to school events and games and have experienced joy and a sense of belonging when cheering for their teams. The removal of the Chiefs name and logo takes away that sense of inclusion and connection, causing them emotional distress and a feeling that their heritage is unwelcome.

252. Part 123 has also chilled Christopher's and H.C.'s ability to express pride in their Native American heritage.

253. Upon the State stripping away the Chiefs name and logo, the District would be expected to initiate a formal process allowing the community to vote on a new name and logo. However, under Part 123, both Christopher and H.C. will be categorically barred from proposing or voting for any name, symbol, or imagery that reflects their Native American identity. This exclusion prevents them from fully participating in the democratic process on equal terms with other community members. It constitutes another form of unlawful discrimination and exclusion because it singles out Native Americans for unequal treatment solely based on race, national origin, and viewpoint.

254. Because the regulation compels the District and Board to violate the constitutional speech rights of other parties, it falls squarely within the "constitutional proscription" exception to the general rule that governmental entities lack capacity to sue the State.

255. Accordingly, Plaintiffs are entitled to a declaration that the denial was unconstitutional, a permanent injunction barring any further enforcement of Part 123, and an award of attorneys' fees and such other relief as the Court deems just and proper.

47

II.    **Part 123's Discriminatory Ban on Contracting With, and By, Native Americans, Effectively Invalidates The District's and NAGA's Contractual Rights in Violation of State Law.**

a.    **Part 123 Compels the District to Discriminate Against Native American Tribes and Individuals By Eliminating Their Right to Contract.**

256.    Part 123 discriminates on the basis of race and national origin because it bars public school districts from contracting with Indigenous individuals or organizations, while permitting identical contracts with groups of any other race or national-origin background.

257.    Part 123.4(b) offers only a narrow carve-out—preserving pre-May 3, 2023 written agreements with recognized tribes—while flatly forbidding any new agreements thereafter. By categorically denying Indigenous groups the ability to contract after that date regarding their name, image, and likeness ("NIL"), the regulation discriminates against Indigenous peoples, imposing a race- and national-origin-based bar on their contractual rights that no other group faces.

258.    Moreover, even the narrow exception allowing school districts and tribes to contract before May 3, 2023, discriminates on the basis of race and national origin by limiting contractual rights only to "federally recognized tribal nations within New York or New York State–recognized tribes." Part 123.4(b). Indigenous individuals and groups lacking formal tribal affiliation are categorically excluded, underscoring the regulation's impermissible targeting of a protected class.

259.    By contrast, school districts are free at any time to enter into identical NIL agreements with individuals or groups of any other race or national origin—none of whom must demonstrate formal affiliation with a recognized tribe or meet any analogous criterion. This disparate treatment deprives Indigenous peoples of the same contracting opportunities afforded to all other groups.

260.    Indeed, many Indigenous nations across the country—not barred by Part 123—

48

have actively and voluntarily engaged in NIL agreements with schools. *See e.g., Spirit Lake Tribe v. Nat'l Collegiate Athletic Ass'n*, 715 F.3d 1089 (8th Cir. 2013) (noting that tribes have entered into NIL agreements with schools).

261.    Furthermore, for agreements signed with tribal nations prior to May 3, 2023, Part 123.4(b) provides that "[a] public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement." This provision expressly prohibits school districts from compensating Indigenous groups and individuals for the use of their names, mascots, or logos—compensation that would otherwise be available to any other racial or national origin group in similar contractual arrangements.

262.    By excluding Indigenous and tribal nations from consideration in such agreements, the regulation imposes a facially discriminatory restriction on one racial and national origin group. It deprives Indigenous groups and individuals of equal access to contractual rights.[14]

263.    As applied in this case, the MSD-NAGA Agreement expressly states that the Plaintiff District provides "Consideration" and "Things of Value" to the NAGA, including commitments to educational programming and the District's continued use of the "Chiefs" name and logo. Ex. D.

---

[14] This is not a theoretical concern. In 2023, the Salamanca City Central School District entered into an agreement with the Seneca Nation of Indians to continue using its "Warrior" nickname and logo. Yet under direct instruction from New York State, through Part 123.4(b), the district was prohibited from providing any form of compensation to the Seneca Nation for the use of its name and logo. This compelled denial of consideration is not only discriminatory but ongoing—and highlights the real-world impact of the regulation. This provision constitutes an unconstitutional restraint on trade and a direct interference with the sovereign right of tribal nations to contract freely and equally with public institutions receiving federal funding. Associated Press, *Seneca Nation Approves Western NY School's 'Warrior' Nickname, Logo*, New York Upstate (May 17, 2023), https://www.newyorkupstate.com/native-american-news/2023/05/seneca-nation-approves-western-ny-schools-warrior-nickname-logo.html.

264.    Because the MSD-NAGA Agreement provides "Consideration" and "Things of Value," Part 123.4(b) forces the Plaintiff District to breach its contractual obligations and discriminate against the NAGA solely on the basis of their Indigenous race and national origin.

265.    In fact, Part 123.4(b)'s blanket ban on "any money, consideration, or thing of value"—which also applies to all pre-May 3, 2023 agreements—effectively precluded school districts from forming valid contracts with Indigenous groups.  Under New York law, contract formation requires offer, acceptance, consideration, mutual assent, and intent to be bound.

266.    Because Part 123.4(b) bans the offer and acceptance of consideration, it impermissibly prevents any enforceable agreement between school districts and Indigenous parties.

b.  **Part 123 Unconstitutionally Compels the Plaintiffs to Discriminate Against and Terminate their MSD-NAGA Agreement with A Native American Group and Individuals.**

267.    Through Part 123, Defendants have already discriminated against Native Americans, including the NAGA. The Plaintiff District entered into the MSD-NAGA Agreement with the NAGA, a group comprised of Native Americans and tribal members.

268.    Part 123 forces the District to terminate the MSD-NAGA Agreement and violate their contractual obligations to the NAGA solely based on the fact that the NAGA is comprised of Indigenous and tribal persons and groups.

269.    Indeed, the District is free to contract with any other individual or group of any race, national origin, color, or ethnic background on the same subject matter. Part 123 solely targets and excludes Indigenous and tribal members from entering into agreements with District and other school districts.

270.    If District is compelled to comply with Part 123, they will incur significant harm,

50

including (a) the substantial costs of replacing the "Chiefs" name and logo; (b) the erosion of community identity and tradition; and (c) legal exposure for breaching their contractual obligations under the MSD-NAGA Agreement and for discriminating in violation of state and federal law.

271.    And the NAGA lost the benefits of its contract, was stripped of its right to contract, and had its Native American heritage erased by Part 123.

## DEFENDANTS DENIED THE PLAINTIFF DISTRICT'S "GOOD CAUSE" EXTENSION REQUEST UNDER PART 123.3(b), THEREBY COMPELLING THIS ACTION

### I.    Defendants' Denial of the Plaintiff District's Request for Extension

272.    On June 10, 2025, the Plaintiff District submitted an extension request letter pursuant to Part 123.3(b). *See* Ex. E.

273.    On June 20, 2025, NYSED denied the Plaintiffs' request for extension pursuant to Part 123.3(b). *See* Ex. F.

274.    NYSED's denial letter stated that "[t]he Massapequa Union Free School District ('the District') has not demonstrated good cause within the meaning of§ 123.3(b) of the regulations or the accompanying guidance document entitled Background and Frequently Asked Questions Regarding Part 123.1 Therefore, on behalf of the Commissioner, the District's request for an extension is denied."

275.    NYSED's denial letter further stated:

> As outlined in the FAQ guidance document, an extension may be granted only where good cause is demonstrated. Good cause can only be shown where there have been good faith efforts toward compliance. Examples of good faith compliance listed in the FAQ document include:
>
> > • The inability of specific staff, contractors, or consultants to complete work on a timely basis if approximately 75% of the work has been completed and is ongoing;
> > • Replacement costs that could be substantially mitigated by a brief postponement; and

51

• For capital projects, where work has commenced and approximately 75% of necessary work will be completed by the end of the 2024-2025 academic year,. With appropriate attestation.

276. NYSED's denial letter continued: "While the regulation allows districts to request extensions, such requests must demonstrate good cause and ***active, good faith efforts toward compliance***." (emphasis added).

277. In denying the District's request, NYSED invented a new standard of review—"active, good-faith efforts toward compliance"—that appears in neither Part 123 nor the Department's own FAQ. By imposing this invented requirement, Defendants acted arbitrarily, capriciously, and ultra vires.

278. NYSED's denial letter further stated: "The District's extension request reveals that nothing whatsoever has been done to eliminate the use of its 'Chiefs' name, logo, or mascot. Indeed, at times, the District has suggested that it has no intention of complying with these regulations. For example, the District recently hosted a 'Save the Chief!' fundraiser on district property on June 7, 2025."

279. That same day, the Plaintiffs contacted NYSED to "request information about the appeal process for this decision." *See* Ex. G. In their request to NYSED, the Plaintiffs noted, "Both the regulation and non-binding FAQ guidance lack any reference to an appeal process, so we are left without any direction on this matter."

280. That same day, NYSED responded that "[n]o administrative appeal is available on this issue."

281. That same day, the Plaintiffs responded to NYSED stating that they "disagree with NYSED's decision." The Plaintiffs then submitted "the following questions regarding Part 123 compliance":

52

According to the nonbinding FAQ guidance (p. 4), "Any district that requires assistance or has questions can contact NYSED by emailing the Office of Indigenous Education."  We request answers to the following questions pursuant to this provision of the nonbinding FAQ guidance. Importantly, all of these questions bear directly on the District's ability to demonstrate "good cause" and influence the District's ability to "submit a future request" as noted in your denial letter:

1.  Can you provide an official, full and complete definition of "good cause" in Part 123?

2.  Can you provide an official, full and complete definition of "good faith compliance" on page 10 of NYSED's FAQ guidance?

3.  Can you provide an official, full and complete definition of "Replacement costs" on page 10 of NYSED's FAQ guidance?

4.  Can you provide an official, full and complete definition of "significant progress (approximately 75%)" on page 10 of NYSED's FAQ guidance?

5.  Can you provide an official, full and complete definition of "good faith efforts" as it is used in your denial letter?

6.  Is the bulleted list under "good faith compliance" (on page 10 of NYSED's FAQ guidance) a full and complete list of ways that school districts can satisfy "good faith compliance," or can school districts demonstrate "good faith compliance" through additional means?

7.  What is NYSED's official position and guidance on how school districts can legally comply with Part 123, while the U.S. Department of Education (DOE) has already determined that compliance with Part 123 is a violation of Title VI of the Civil Rights Act of 1964?

8.  If a school district—like Massapequa—has a contractual agreement with an Indigenous organization and individuals expressly authorizing continued use of a Native American name or logo, does Part 123 require the district to breach that agreement?

9.  What are the specific consequences NYSED intends to impose on districts found noncompliant as of July 1, 2025? This bears directly on the District's evaluation of "replacement costs."

Clear and complete answers to the above questions are necessary for the District to evaluate its legal obligations and potential submission of a future extension request.

282.  Rather than providing guidance, NYSED responded, on June 22, 2025, that "[y]our

53

request has been denied for the reasons articulated in the June 20 letter. The Department declines to provide you or your client legal advice."

283. That same day, the Plaintiffs responded to NYSED clarifying that "we are not seeking legal advice in any of the below questions."

284. The Plaintiffs further clarified that "[a]s referenced in [our] prior message and as stated plainly on page 4 of NYSED's own nonbinding FAQ guidance, 'Any district that requires assistance or has questions can contact NYSED by emailing the Office of Indigenous Education.'"

285. The Plaintiffs then stated that "[o]ur correspondence constitutes an effort to request such assistance. The nine questions submitted—each narrowly tailored to address core matters within Part 123 and NYSED's FAQ guidance—fall squarely within the scope of this invitation. It is both surprising and concerning that your Office has declined to address any of them, particularly given that these questions directly implicate the District's ability to comply with Part 123 and relevant federal law."

286. The Plaintiffs further articulated:

> By way of example: Question 4 asks, Can you provide an official, full and complete definition of 'significant progress (approximately 75%)' on page 10 of NYSED's FAQ guidance?" This is not a request for legal advice—it is a straightforward clarification of a quantitative threshold that your Office has repeatedly invoked to grant or deny extensions. If the Department is applying a metric to determine "75%," then it necessarily must be relying on an internal definition or standard.

287. The Plaintiffs then noted that "[t]he same logic holds true for questions 1, 2, 3, 5 and 6 below."

288. The Plaintiffs concluded this June 22 correspondence by "respectfully reassert[ing] our request for answers to Questions 1 through 9 as an effort to obtain the 'assistance' expressly offered by the Department under its own published guidance." The Plaintiffs noted that "[t]he

54

Department's blanket refusal to provide such assistance only compounds the risk of arbitrary enforcement and legal exposure for districts acting in good faith."

289.    NYSED did not respond to the Plaintiffs' June 22 correspondence.

290.    In light of the impending June 30, 2025, compliance deadline, the Plaintiffs again followed up with NYSED seeking guidance on June 24, 2025.

291.    The Plaintiffs' June 24 correspondence stated that Plaintiffs were "following up once again to respectfully request clarification and assistance from your office pursuant to the Department's own guidance."

292.    The Plaintiffs' June 24 correspondence expressed urgency: "the compliance deadline is rapidly approaching, and your June 20 denial letter indicated that while no administrative appeal is available, the District may submit another extension request. The District requests clear guidance from your office in light of the criteria you cited for denial."

293.    Plaintiffs' June 24 correspondence also "reiterate[d], we are not seeking legal advice. Our questions reflect direct, narrowly tailored requests for clarification—such as a working definition of the very standards the Department just applied to deny our extension request (e.g., 'good cause,' 'significant progress,' and 'good faith compliance')."

294.    This correspondence further emphasized that "**[i]t is deeply concerning that the Department refuses to define the criteria it is using to evaluate compliance, particularly when school districts are expected to meet those standards under threat of penalty.** These terms are undefined (and some non-existent) in the regulation, undefined in the guidance, and now undefined by the Department itself."  (emphasis in original).

295.    The Plaintiffs' correspondence concluded that Plaintiffs "again request responses to the nine questions previously submitted. We view this as a good-faith effort to obtain assistance

55

under the process your own guidance invites."

296.    That same day, NYSED responded that it would not provide any guidance: "The Department will not be responding to prescriptive questions such as these in the future."

297.    In particular, NYSED's June 22 response stated that the "Terms such as 'good faith' and 'significant' may be safely defined with resort to a dictionary."

298.    NYSED commented that "[c]ommonly understood terms such as this are rarely, if ever, defined in agency regulations (*e.g.*, 3 NYCRR 43.10; 9 NYCRR 5014.8 [d]; 9 NYCRR 5311.8 [a], [b])."

299.    NYSED then stated explicitly that it would not be providing the Plaintiffs with guidance for a resubmitted request because it had already predetermined its rejection of such a renewed request: "Moreover, there is no purpose in defining the precise contours of 'significant progress' where Massapequa admits that it has made no progress."

300.    This action followed.

## II.    Other School Districts Have Been Granted Extensions Under Part 123.3(b) Despite Not Satisfying the "Good Cause" Standard

301.    Despite denying the Plaintiffs' request for extension under Part 123.3(b), NYSED has granted extension requests to other school districts that have failed to meet the "good cause" standard.

302.    On April 24, 2025, the Wantagh Union Free School District submitted an extension request to NYSED pursuant to Part 123.3(b). *See* Ex. H.

303.    The Wantagh Union Free School District submitted the extension request via email to David Frank at David.Frank@nysed.gov.  The Wantagh Union Free School District did not submit the request to the required email address stated in the FAQ (mascotadvisory@nysed.gov).

304.    In its extension request, the Wantagh Union Free School District conceded that, at

56

the time it submitted its extension request, it had not yet achieved 75% compliance—it merely "anticipates completion of over 75% of the work by June 30, 2025."

305.    Despite the Wantagh Union Free School District's explicit admission that it had not achieved 75% compliance, NYSED nevertheless granted a year-long extension to the Wantagh Union Free School District on April 29, 2025.

306.    In its response granting the extension, NYSED stated: "After consideration of the circumstances outlined in your request, the Wantagh Union Free School District ('the District') has demonstrated good cause for the granting of an extension."

307.    Furthermore, NYSED stated "[s]pecifically, the District has shown evidence of good faith compliance, including that significant progress-approximately 75%-toward eliminating the use of Indigenous names, mascots, and logos will be completed by June 30, 2025; that facilities work commenced in 2023 and continues with substantial capital projects underway; and that replacement costs for uniforms and rebranding efforts could be substantially mitigated by allowing additional time for completion."

308.    Notably, the standard that NYSED invented to deny the Plaintiffs' request—"active, good-faith efforts toward compliance"—appeared nowhere in NYSED's letter reviewing and granting the Wantagh Union Free School District's request.

309.    NYSED's letter further emphasized: "Please be reminded that any new team name, mascot, or logo chosen by the District must be compliant with the Part 123 regulations. Any team names, mascots, or logos derived from, or having connections to, Indigenous peoples-past or present-are contrary to the requirements of the regulation and New York State's Dignity for All Students Act, except as provided in §123.4 of the regulations."

310.    Similarly, the Connetquot Central School District submitted an extension request

57

on May 6, 2025. *See* Ex. I.

311.    The Connetquot Central School District submitted the extension request via email to David Frank at David.Frank@nysed.gov.  The Connetquot Central School District did not submit the request to the required email address stated in the FAQ (mascotadvisory@nysed.gov).

312.    Indeed, on April 24, 2025, counsel for the Connetquot Central School District emailed Daniel Morton-Bentley, at NYSED, recognizing that "I'm aware I need to send the extension request eventually to the designated e-mail address[.]"

313.    Still, the Connetquot Central School District failed to send the extension request to the required email address.

314.    On May 13, 2025, NYSED granted the Connetquot Central School District's request for extension through March 1, 2026.

315.    NYSED's extension letter stated: "After reviewing the information provided, the Connetquot Central School District ('the District') has demonstrated good cause for an extension. The District has made substantial progress-approximately 75%-toward eliminating the use of Indigenous-associated names and imagery by June 30, 2025. The remaining work is expected to be completed by March 1, 2026."

316.    Notably, the standard that NYSED invented to deny the Plaintiffs' request— "active, good-faith efforts toward compliance"—appeared nowhere in NYSED's letter reviewing and granting the Connetquot Central School District's request.

317.    The extension letter explicitly stated: "Please be reminded that any new team name, mascot, or logo adopted by the District must fully comply with Part 123. As noted in prior court filings by the District, the current team name, 'Thunderbirds,' was selected 'to honor the Indian culture in the area.' Any name, mascot, or logo derived from or connected to Indigenous peoples-

past or present-is prohibited under the regulation and the Dignity for All Students Act, except as provided in § 123.4."

318.    The Connetquot Central School District then continued discussions with NYSED regarding the use of an alternative logo and team name.

319.    On May 14, 2025, the Connetquot Central School District emailed NYSED: "The District would like to inquire as to whether 'Thunder' would be an acceptable mascot (second option would be 'Thunderbolts')." *See* Ex. J.

320.    On May 30, 2025, NYSED responded that "[w]hile SED does not view Thunder or Thunderbolts with an eagle and/or lightning bolt as impermissibly derived, we are of the opinion that continuing the litigation with this approval in hand would be in bad faith.  Please advise as to the District's intentions."

321.    Defendants later pressured the Connetquot Central School District to drop its litigation in exchange for the Connetquot Central School District keeping a shortened "T-birds" name.

322.    In fact, for two years, the Connetquot Central School District represented to the Easter District of New York, in sworn statements, that the "T-birds" name and logo derive from Native American origins.

323.    On November 5, 2024, the Connetquot Board and District filed a letter in court stating: "Plaintiffs would have to retire the Thunderbirds and T-Birds names and choose another one, and physically remove all traces of the existing Thunderbird (and T-Bird) logos, imagery, and mascot" under the ban. *See* Ex. K, p. 2.

324.    This is a blatant admission—in a court filing—that the use of T-birds is banned by Part 123.

59

325. The Connetquot District's and Board's complaint filed in court also conceded: "Over the years, the 'Thunderbirds' name also morphed into the popular nickname: 'T-Birds'" and thus it is banned by the regulation. *See* Ex. L, p. 2 (¶¶ 70-72).

326. Throughout litigation, Defendants also rejected the Connetquot District's and Board's attempts to use "T-birds" because it violated Part 123.

327. On May 27, 2025, Connetquot's litigation counsel reported: "We pressed the Attorney General's office to allow the use of T-Birds. Although the lawyers at the Attorney General's office seemed receptive to T-Birds, after several communications they advised that [NYS Education Department] would not accept that." *See* Ex. M.

328. On May 30, 2025, the Assistant Attorney General confirmed in writing: "We have confirmed that [NYS Education Department] considers, based on paragraph 70 of the Amended Complaint, 'Thunderbirds' or 'T-Birds' to both be impermissible." *See* Ex. N.

329. But just two weeks later, the Defendants arbitrarily reversed course and sought to settle with Connetquot by allowing it to keep "T-Birds."  The settlement would require the Connetquot District to drop its litigation.

330. On June 18, 2025, Connetquot's counsel wrote that he "negotiated an agreement with the State to allow the T-Birds name" but "[t]here is one condition, that we represent that 'T-Birds' has not been associated with indigenous imagery." Counsel added: "I am confident we can make this work. The State seems motivated to resolve it and I do not think they will be looking to prove a connection." *See* Ex. O.

331. On June 25, 2025, Connetquot's counsel advised the Superintendent that the Attorney General's Office is "willing to move quickly, and they want to, but they are skeptical of us making edits to the agreement." *See* Ex. P.

332. That same day, an updated settlement draft was circulated. *See* Ex. Q. Page 4 requires Connetquot to represent that "T-Birds" has never been associated with any authentic Indigenous imagery of any kind, which is a material misstatement vis-à-vis the Connetquot District and Board's court statements saying otherwise.

333. The agreement also requires that the District and Board give up their pending federal appeal and waive their rights to all future litigation challenging the Native American Mascot Ban. (*Id.,* pp. 3-5).

334. The Connetquot District signed this agreement in September 2025, allowing them to keep the "T-birds" name—a name that both Connetquot and Defendants recognized violates Part 123—in exchange for ending their litigation.

335. This about-face demonstrates the improper, arbitrary, and capricious nature of Part 123 and the Defendant's enforcement.

**AS AND FOR A FIRST CAUSE OF ACTION BY ALL INDIVIDUAL PLAINTIFFS AGAINST ALL DEFENDANTS**
**(Part 123 Is Impermissibly Overbroad in Violation of the First Amendment of the U.S. Constitution)**

336. Plaintiffs repeat and reallege each and every allegation contained above and below.

337. Part 123 is unconstitutionally overbroad under the First Amendment both facially and as applied to Plaintiffs Caramore, Wachter, Christopher, and their minor children, M.C., L.W., and H.C.

338. The First Amendment doctrine of overbreadth provides that a law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to its legitimate sweep. *See Virginia* v. *Hicks*, 539 U.S. 113, 122, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).

339. In determining whether a regulation is substantially overbroad, a court may

examine possible applications of the regulation in factual contexts other than those of the plaintiff in the instant case. *See NAACP v. Button,* 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Overbreadth challenges are based upon the hypothetical application of a regulation to third parties. *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). In fact, overbreadth challenges are an exception to the general rule against third-party standing, allowing a plaintiff to ask that a law be struck down based not on how it affects the plaintiff but on how it might be applied to third parties not before the court. This is based on a recognition that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

340.    Under the third-party standing exception, this case is not just about Plaintiffs' right to engage in First Amendment expressive activity, or their fellow Board members' ability to do so. Part 123 stands to chill the expressive activity of many more individuals. The District has approximately 650 employees, all of whom will also be prohibited from wearing Chiefs apparel on school property come June 30, 2025.

341.    But Part 123's prior restraint strays far beyond that. It will also chill the expressive activity of every future District employee or official, so long as it is in effect. Those potential future employees could be current students or recent graduates who have gone off to college with the intent to someday return to the Massapequa and serve as a District employee or official—just like Plaintiff Caramore.

342.    Part 123's reach goes even further than current and future District employees or officials. Part 123 is a state-wide ban that affected 13 public school districts on Long Island and about 60 public school districts throughout New York State. The chilling effect of Part 123 is immense.

343.    Part 123 should be invalidated as substantially overbroad because it reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions that cannot survive strict scrutiny, as discussed in further detail below. In other words, Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its purported plainly legitimate sweep.

344.    Part 123 lacks any tailoring to Defendants' purported goal, which is to prevent DASA violations. Part 123 does not even provide a mechanism to determine whether a DASA violation has occurred, or is likely to occur, in a particular school district so as to warrant a team name, logo, or mascot change. Rather, it creates a sweeping, policy-based determination that strays far beyond the scope of the enabling statute (DASA) and in doing so creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment.

345.    Not only did Part 123 fail to provide a mechanism to determine whether a DASA violation ever occurred in the District (or at any other) in relation to its sports team name or logo, but the NYSED has no evidence of any such violations occurring in the District, and never made attempts to collect such evidence. And as discussed above, none exists. On the contrary, in the 70 years the Chiefs name and logo have been in use, the District has never received a complaint about its team name and logo, in the context of a DASA complaint or otherwise. The NYSED (through sworn testimony given by Assistant Commissioner of Education David Frank) conceded that before enacting Part 123, the NYSED only informally surveyed tribal nations about the use of team names, mascots, and logos, but did not survey any school districts or students.

346.    Part 123 also unconditionally restricts the speech and expression of Plaintiff Christopher and her minor child, H.C., who are Native Americans in the District. They are unable

63

to express their identity and message through school programs and sports teams due to the Part 123 ban.

347. Likewise, the speech of the Foundation is unconstitutionally restricted because the Foundation was organized to promote the use of "Chiefs" in the District, and Part 123 eliminates that form of expression and speech.

348. Plaintiffs are entitled to a final judgment declaring that Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep.

**AS AND FOR A SECOND CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**
**(Part 123 Violates Title VI of the Civil Rights Act of 1964)**

349. Plaintiffs repeat and reallege each and every allegation contained above and below.

350. Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

351. Title VI prohibits intentional discrimination based on race, color, and national origin in any program that receives federal funding. *See id.*

352. The Defendants are, and operate, programs that receive federal funding.

353. The District, and other similarly situated school districts in New York, also receive federal funding through the Defendants.

354. Title VI applies to both the Plaintiffs and Defendants.

355. Part 123 violates Title VI in three independent respects: (1) it compels school districts to eliminate Indigenous names, logos, and mascots—targeted symbols of a protected

64

racial and national-origin group; (2) it coerces districts into discriminatory contracting practices by invalidating or forbidding agreements with Indigenous individuals and organizations; and (3) it mandates adverse treatment of certain Indigenous school officers and employees by barring their use or promotion of culturally affiliated imagery on school property.

356.    First, Part 123 violates Title VI by discriminating on the basis of race and national origin because it compels public schools to remove Indigenous names, logos, and mascots—symbols of a protected group—while leaving intact imagery representing any other racial or national-origin group. School districts can display the names, symbols, and logos of any individual, group, or peoples of any racial or national origin group—except for Indigenous peoples.

357.    For example, Part 123 targets and requires the removal of Indigenous symbols—including the Plaintiffs' "Chiefs" name and logo in Massapequa—while allowing all other names, logos, and mascots of other racial and national origin groups to remain in place, such as the "Fighting Irish" or "Vikings."

358.    By compelling Plaintiffs and other districts to abandon their Indigenous names and logos, Part 123 singles out and burdens Indigenous peoples—members of a protected racial and national-origin group—in direct violation of Title VI.

359.    Indigenous groups nationwide have opposed Part 123. For example, a Department of Education Office for Civil Rights complaint filed by the NAGA—a collective of "American Indian enrolled members and tribal descendants" who "stand united to preserve the rich legacy of our ancestors and ensure that American Indian names, symbols, and traditions are honored"[15]– catalyzed a Title VI investigation by the Department of Education.

---

[15] Native American Guardians Ass'n, *Native American Guardians Association*, https://www.nagaeducation.org/ (last visited May 2, 2025).

65

360.    Second, Part 123 violates Title VI by discriminating on the basis of race and national origin because it bars public school districts from contracting with Indigenous individuals or organizations, while permitting identical contracts with groups of any other race or national-origin background.

361.    Part 123.4(b) offers only a narrow carve-out—preserving pre-May 3, 2023 written agreements with recognized tribes—while flatly forbidding any new agreements thereafter. By categorically denying Indigenous groups the ability to contract after that date regarding their NIL, the regulation effectively singles out and penalizes Indigenous peoples, imposing a race- and national-origin-based bar on their contractual rights that no other group faces.

362.    Moreover, even the narrow exception allowing school districts and tribes to contract before May 3, 2023, discriminates on the basis of race and national origin by limiting contractual rights only to "federally recognized tribal nations within New York or New York State–recognized tribes." Part 123.4(b). Indigenous individuals and groups lacking formal tribal affiliation are categorically excluded, underscoring the regulation's impermissible targeting of a protected class.

363.    By contrast, school districts are free at any time to enter into identical NIL agreements with individuals or groups of any other race or national origin—none of whom must demonstrate formal affiliation with a recognized tribe or meet any analogous criterion. This disparate treatment is a textbook facial violation of Title VI, depriving Indigenous peoples of the same contracting opportunities afforded to all other groups.

364.    As applied to Plaintiffs, the MSD–NAGA Agreement is a valid, post–May 3, 2023 written contract between the Plaintiffs and a consortium of Indigenous nations, tribes, and individuals that expressly permits and obligates Plaintiffs to continue using the "Chiefs" name and

66

logo. Because Part 123 categorically bars any such agreement after May 3, 2023, Plaintiffs face an impossible choice—comply with the regulation or discriminate against the NAGA and fail to satisfy their contractual obligations—creating a direct conflict that violates Title VI.

365.    By forcing Plaintiffs to abandon their contractual obligations solely because the NAGA is composed of Indigenous nations and individuals and because the agreement involves Indigenous-based NIL, Part 123 compels a breach of the MSD-NAGA Agreement and discriminates against the NAGA on the basis of race and national origin, in direct violation of Title VI.

366.    Had Plaintiffs entered into identical NIL agreements with any non-Indigenous group or individual, Part 123 would impose no prohibition on those contracts and would not force Plaintiffs to breach their obligations.

367.    Furthermore, for agreements signed with tribal nations prior to May 3, 2023, Part 123.4(b) provides that "[a] public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement." This provision expressly prohibits school districts from compensating Indigenous groups and individuals for the use of their names, mascots, or logos—compensation that would otherwise be available to any other racial or national origin group in similar contractual arrangements.

368.    By excluding Indigenous and tribal nations from consideration in such agreements, the regulation imposes a facially discriminatory restriction that violates Title VI. It deprives Indigenous groups and individuals of equal access to contractual rights.[16]

---

[16] This is not a theoretical concern. In 2023, the Salamanca City Central School District entered into an agreement with the Seneca Nation of Indians to continue using its "Warrior" nickname and logo. Yet under direct instruction from New York State, through Part 123.4(b), the district was prohibited from providing any form of compensation to the Seneca Nation for the use of its name

369.    As applied in this case, the MSD-NAGA Agreement expressly states that the Plaintiffs provide "Consideration" and "Things of Value" to the NAGA, including commitments to educational programming and the Plaintiffs' continued use of the "Chiefs" name and logo.

370.    Because the MSD-NAGA Agreement provides "Consideration" and "Things of Value," Part 123.4(b) forces the Plaintiffs to breach their contractual obligations and discriminate against the NAGA solely on the basis of their Indigenous race and national origin.

371.    Had the Plaintiffs entered into a similar agreement with any other racial or national origin group—and provided consideration—there would be no such prohibitions and breach. By excluding Indigenous peoples and groups from consideration in such agreements, the regulation imposes a facially and as-applied discriminatory restriction that violates Title VI.

372.    In fact, Part 123.4(b)'s blanket ban on "any money, consideration, or thing of value"—which also applies to all pre-May 3, 2023 agreements—effectively precluded school districts from forming valid contracts with Indigenous groups. Under New York law, contract formation requires offer, acceptance, consideration, mutual assent, and intent to be bound. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." (quotation marks omitted)); *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 252 (2d Cir. 2019) ("The requirement that a contract be supported by consideration has continued, with slight

---

and logo. This compelled denial of consideration is not only discriminatory but ongoing—and highlights the real-world impact of the regulation. In addition to violating Title VI, this provision constitutes an unconstitutional restraint on trade and a direct interference with the sovereign right of tribal nations to contract freely and equally with public institutions receiving federal funding. Associated Press, *Seneca Nation Approves Western NY School's 'Warrior' Nickname, Logo*, New York Upstate (May 17, 2023), https://www.newyorkupstate.com/native-american-news/2023/05/seneca-nation-approves-western-ny-schools-warrior-nickname-logo.html.

modification, into the present, where it remains an essential element of contract formation: 'Where no consideration exists, and is required, the lack of consideration results in no contract being formed in the absence of a substitute for consideration' such as estoppel.") (citations omitted)).

373. Because Part 123.4(b) bans the offer and acceptance of consideration, it prevents any enforceable agreement between school districts and Indigenous parties, thereby discriminating on impermissible grounds.

374. Third, Part 123 is unconstitutional because Part 123.5 discriminates against Indigenous school officers and employees who are not members of a tribal nation by prohibiting them from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school functions—a facial violation of Title VI.

375. Part 123.5 states: "Public schools shall prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." It then carves out a narrow exception for *only tribal members*, providing: "This provision shall not apply to any school officer or employee *who is a member of a tribal nation* and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation." Part 123.5 (emphasis added).

376. This arbitrary distinction means that Indigenous school personnel who are not formally affiliated with a tribal nation are barred from expressing or honoring their own culture, heritage, or identity. No other racial, ethnic, cultural, or national origin group is subject to such a "tribal affiliation" requirement or subsequent prohibition. By creating this discriminatory restriction, Part 123 imposes a discriminatory burden that directly violates Title VI.

377. Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability

69

from Title VI claims. Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

378.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of Title VI.

379.    Plaintiff Christopher's child H.C., a Native American child in the District, is also excluded from programs, denied equal benefits, and suffers discrimination based on her race and national origin due to the adoption of Part 123 because the Rule eliminates any representation of her Native American identity and expression.

380.    H.C. is an intended beneficiary of the District's and State's programs and activities receiving federal assistance.

381.    By only eliminating Native American imagery, names, and logos, the Rule—and Defendants— discriminated against H.C. on the basis of race and national origin in connection with the programs and activities.

382.    The Rule, and Defendants' enforcement of it, are intentionally discriminatory because they expressly single out Native American names, imagery, and logos in the text of Part 123. In practice, enforcement has compelled the removal of only Native American representations from school districts, like in Connetquot and Amityville. The substantial and motivating factor behind the Rule's adoption and enforcement was the elimination of Native American representation—a clear reflection of discriminatory intent and purpose.

383.    Plaintiffs Caramore and Wachter also have children, M.C. and L.W., who are intended beneficiaries of Title VI, and they are also excluded from participation in and denied the benefits of programs with adequate and equal cultural representation due to Part 123's

70

discriminatory ban.

384.  Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Title VI and otherwise invalid, and to a permanent injunction barring its enforcement against them.

**AS AND FOR A THIRD CAUSE OF ACTION BY THE DISTRICT AND CARAMORE AGAINST ALL DEFENDANTS**
**(Part 123 Violates the First Amendment Rights of Incumbent and**
**Non-Tribal Member Candidates)**

385.  Plaintiffs repeat and reallege each and every allegation contained above and below.

386.  Part 123 is unconstitutional because it violates the First Amendment rights of incumbent school board members, as well as district employees and officers who are running for the school board and are not members of a tribal nation.

387.  Under Part 123, school officers and employees—including incumbent board members—are prohibited from "utilizing or promoting any Indigenous name, logo, or mascot" while on school property or at school functions, unless they are members of a tribal nation. This restriction applies even when the Indigenous name or logo is historically associated with the school and is a core part of the board member-candidate's political campaign message and identity.

388.  This restriction prevents incumbent school board members (who are not members of tribal nations) from engaging in protected political expression during campaigns, including wearing apparel (e.g., jackets, hats, pins, or team gear) bearing the school's Indigenous name or logo during school events such as football games, which are traditional campaign forums in local elections.

389.  This restriction also prevents school employees and officers (who are not members of tribal nations) from engaging in protected political expression if they run for school board, including wearing apparel (e.g., jackets, hats, pins, or team gear) bearing the school's Indigenous name or logo during school events.

71

390. Part 123 does not apply to school board candidates who are not current district employees, officers, or board members. Nor does it apply to board members, officers, or employees who are members of a tribal nation. These candidates may freely attend the same school functions wearing Indigenous-branded apparel of their school or distributing campaign materials bearing Indigenous names and logos to advance their campaign messaging. This creates a content-based, speaker-based, and viewpoint-based asymmetry in school board elections.

391. This asymmetrical restriction operates to chill the protected speech of incumbent candidates and candidates who are school employees and officers (who are not members of tribal nations). As in *Davis v. FEC*, 554 U.S. 724 (2008), where the Supreme Court struck down a statute that gave preferential fundraising rights to non-self-financing candidates, the Defendants here impose a structural burden on First Amendment rights, giving non-incumbent candidates, non-district-employed candidates, and tribal nation member candidates a constitutionally impermissible advantage.

392. In *Davis*, the Supreme Court emphasized that a candidate cannot be forced to "choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." *Davis v. FEC*, 554 U.S. 724, 739 (2008). Yet that is precisely what Part 123 imposes here: a government-forced decision between exercising First Amendment rights or compliance with a discriminatory ban.

393. For example, if a school board candidate forum were held on school property in Massapequa School District, only the incumbents would be forced to remove "Chiefs" apparel, while challenging candidates (not employed by the District) and tribal nation candidates would be free to use and promote the "Chiefs" name and logo to advance their political and campaign messaging.

394.    By suppressing one class of speakers (incumbents and district-employed candidates) based on their status and content of their message (supporting the continued use of Indigenous names/logos), the regulation is not narrowly tailored to any compelling governmental interest.

395.    As applied here, Plaintiff Caramore is an incumbent member of the Massapequa Board of Education and intends to seek re-election during the next eligible election cycle. She is not a member of a tribal nation and is subject to Part 123's prohibition on "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at a school function.

396.    In connection with her campaign, Plaintiff Caramore plans to engage in expressive and speech conduct by wearing apparel bearing the "Chiefs" name and logo—representing the school's historical identity—and by distributing campaign materials featuring the same. She also plans to use slogans like "Once a Chief, Always a Chief." She intends to do so at school-sponsored events and on school property, including football games, concerts, ceremonies, and other public functions that serve as traditional forums for candidate engagement and voter outreach.

397.    Part 123 prohibits her from engaging in this protected expression solely because of her status as a school officer and non-tribal member, thereby infringing her First Amendment rights.

398.    The District is compelled to enforce this unconstitutional regulation in violation of Caramore's, and other District personnel's, First Amendment rights.

399.    Accordingly, Part 123 is unconstitutional under the First Amendment.

400.    Plaintiffs are entitled to a declaratory judgment that Part 123 is unconstitutional and to a permanent injunction enjoining its enforcement against them.

73

**AS AND FOR A FOURTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS**
**(Part 123 Violates 42 U.S.C. § 1981)**

401.    Plaintiffs repeat and reallege each and every allegation contained above and below.

402.    Plaintiffs plead this claim through 42 U.S.C. § 1983.

403.    Part 123 is unconstitutional under Section 1981 because it (a) bars every public school from entering into contracts with Indigenous tribes, and (b) prohibits any "money, consideration, or thing of value" in pre-May 3, 2023 tribal agreements—thereby denying Indigenous peoples the "full and equal benefit of all laws" and the right to contract.

404.    Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

405.    This protection extends to all "racial" discrimination in contract formation and enforcement, including on the basis of ancestry, ethnicity, and color. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts.").

406.    On its face, Part 123.4 prohibits any new contracts between public schools and Indigenous tribes after May 3, 2023, while permitting identical contractual relationships with groups of every other race or national origin.

407.    Part 123.4(b) further bars "any money, consideration, or thing of value" in all pre-May 3, 2023 agreements. That blanket ban renders contract formation with Indigenous parties impossible, as New York law requires offer, acceptance, consideration, mutual assent, and intent

74

to be bound.

408.    By denying Indigenous groups and individuals both the right to enter new NIL contracts and the ability to receive any consideration in existing ones—while imposing no comparable restrictions on any other racial, national origin, or ethnic group—Part 123 discriminates on the basis of race and national origin in NIL contract formation, in direct conflict with Section 1981.

409.    As applied here, the MSD–NAGA Agreement is a valid, post–May 3, 2023 contract between Plaintiffs and the NAGA (a consortium of Indigenous nations and individuals) that obligates Plaintiffs to continue using the "Chiefs" name and logo in exchange for consideration. Part 123's interdiction of such agreements both (i) nullifies Plaintiffs' contractual rights, and (ii) forces Plaintiffs to breach their contractual obligations solely because of the NAGA's Indigenous status.

410.    Had Plaintiffs entered into an identical NIL agreement with a non-Indigenous individual or group, Part 123 would impose no prohibition and would not compel breach.

411.    If Part 123 invalidates the MSD-NAGA Agreement, the Plaintiffs face the loss of a valid NIL agreement, damage to relationships with tribal partners, and the erosion of the Plaintiff District's reputation and goodwill.

412.    Plaintiffs Christopher (and her child, H.C.) and the Foundation are third-party beneficiaries of the Agreement.

413.    The Rule, and Defendants' enforcement of it, are intentionally discriminatory because they expressly eliminate the contractual rights of Native Americans in the text of Part 123. In practice, enforcement has compelled the removal of only Native American representations from school districts, like in Connetquot and Amityville. Enforcement has also compelled the

75

termination of the MSD-NAGA Agreement. This reflects discriminatory intent and motive.

414.    Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability based on breach of contract claims, Title VI claims, and Title VII claims.

415.    Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

416.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of Section 1981.

417.    Accordingly, Part 123 violates Section 1981 and must be declared unconstitutional. Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Section 1981, and to a permanent injunction barring its enforcement against them.

**AS AND FOR A FIFTH CAUSE OF ACTION BY THE DISTRICT
AGAINST ALL DEFENDANTS
(Part 123 Violates Title VII of the Civil Rights Act of 1964)**

418.    Plaintiffs repeat and reallege each and every allegation contained above and below.

419.    Part 123 facially violates Title VII because it directs school districts to discriminate against certain Indigenous people with respect to the terms, conditions, and privileges of their employment because of their race and national origin.

420.    Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

421.    Title VII applies to state, local, and federal governments with at least 15 employees.

*Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 4 (2018) ("The 1972 amendment to Title VII thereby extended the statute's coverage to state and local government entities by defining them as 'person[s].' In turn, as 'person[s],' these entities meet Title VII's definition of 'employer' and are subject to liability only if they have at least 15 employees.")

422.    The District is a local government employer with at least 15 employees and is thus subject to Title VII.

423.    Defendants are also a state employer with at least 15 employees and is thus subject to Title VII.

424.    Part 123.5 requires public schools to prohibit school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school functions.

425.    Part 123.5 provides an exception for "any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation."

426.    Although the regulation includes an exception for employees and officers who are *members* of a tribal nation, it flatly prohibits all other Indigenous employees and officers— including those with Indigenous cultural, familial, or ancestral ties—from engaging in the same expression. In doing so, Part 123 discriminates against Indigenous employees and officers based on their race and national origin.

427.    This discriminatory restriction directly affects the terms, conditions, and privileges of employment for a subset of Indigenous individuals on the basis of their race and national origin. It creates a discriminatory requirement based on their tribal affiliation.

428.    No other racial, cultural, or national origin group is subject to a comparable term or

77

condition on the expression of their own culture or identity in the workplace.

429.    The District employs numerous staff whose race and national origin it does not—and cannot reasonably—ascertain without impermissibly probing into protected classifications. Under Part 123's blanket bar, the Plaintiff District must treat every employee as if they might be non-tribal unless that individual affirmatively demonstrates membership in a tribal nation—a status the District has no reliable, non-invasive way to verify.

430.    To comply with Part 123, the Plaintiff District would have to single out and restrict the protected expression of any Indigenous employee not proven to be a tribal member—effectively disciplining or censoring Indigenous staff while allowing non-Indigenous employees free expression.

431.    As demonstrated by Plaintiff Christopher and her daughter H.C.'s presence in the District, there are Native American residents enrolled in schools, living in, and working in Massapequa.

432.    Alternatively, if the Plaintiff District permits all employees to use or promote the "Chiefs" name and logo, it risks sanctions under Part 123.

433.    Compliance with both Title VII and Part 123 is a physical impossibility, and Part 123 stands as an obstacle to Congress' purpose in enacting Title VII.

434.    The Rule, and Defendants' enforcement of it, are intentionally discriminatory because they expressly single out Native American names, imagery, and logos in the text of Part 123. In practice, enforcement has compelled the removal of only Native American representations from school districts, like in Connetquot and Amityville. The substantial and motivating factor behind the Rule's adoption and enforcement was the elimination of Native American representation—a clear reflection of discriminatory intent and purpose.

435. Part 123 compels the District to violate Title VII.

436. Part 123 inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability from Title VII claims from misidentified and mistargeted employees. Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

437. Thus, Part 123 violates Title VII.

438. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of Title VII.

439. Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Title VII, and to a permanent injunction barring its enforcement against them.

**AS AND FOR A SIXTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS**
**(Part 123 Violates the Dormant Commerce Clause)**

440. Plaintiffs repeat and reallege each and every allegation contained above and below.

441. Part 123 violates the Dormant Commerce Clause of the U.S. Constitution (U.S. Const. art. I, § 8, cl. 3) because it discriminates against out-of-state Indigenous tribes while favoring in-state Indigenous tribes.

442. The Dormant Commerce Clause is a constitutional prohibition. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023) ("Assuredly, under this Court's dormant Commerce Clause decisions, no State may use its laws to discriminate purposefully against out-of-state economic interests.").

443. The Dormant Commerce Clause embodies the "principle that one state in its dealings with another may not place itself in a position of economic isolation." *Entergy Nuclear*

79

*Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013) (citation omitted).

444.    Section 123.4(b) establishes protectionist provisions for New York-based and New York-recognized tribal nations, while excluding all other out-of-state tribes from contracting:

> This Part shall not apply where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation **within the State of New York** or a **New York State recognized tribal nation** and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot.

Section 123.4(b).

445.    Part 123 draws a discriminatory line between New York's own tribes (allowed to contract) and every other federally recognized tribe (flatly prohibited from contracting within New York). Both on its face and as applied, Part 123 systematically favors in-state tribes while disadvantaging out-of-state tribes, imposing a substantial and unjustified burden on interstate commerce.

446.    Part 123's burdens on interstate commerce far exceed any marginal benefit in state policy, especially in light of the fact that many tribal nations span across state borders, have been displaced to other states, and have cultures that do not align neatly within New York State's borders.

447.    As applied here, Plaintiffs executed the MSD–NAGA Agreement with NAGA—a consortium of Indigenous tribes, tribal descendants, and individuals—after May 3, 2023, which is rendered invalid by the discriminatory provisions in Part 123. But if this Court were to invalidate only the "effective date" restriction in Part 123.4(b) and leave the rest of Part 123 intact (despite

80

its lack of a severability clause), the regulation would still operate unconstitutionally as applied to the MSD–NAGA Agreement. By blocking post–May 3, 2023 agreements with out-of-state tribes—including with the NAGA—while permitting in-state tribes to contract, Part 123 imposes a substantial, discriminatory burden on interstate commerce in violation of the Dormant Commerce Clause.

448.    Because the MSD–NAGA Agreement includes a consortium of Indigenous tribes, groups, and individuals with some who are either based outside of New York or not formally recognized by New York as a tribe, Part 123's favoritism for in-state tribes imposes a protectionist barrier that unlawfully discriminates against the NAGA and conflicts with federal law.

449.    If Part 123 invalidates the MSD-NAGA Agreement, the Plaintiffs face the loss of a valid NIL agreement, damage to relationships with tribal partners, and the erosion of the Plaintiff District's reputation and goodwill.

450.    The Rule unconstitutionally affects a competitive in-state market and a competitive out-of-state market for Indigenous names and imagery.

451.    For example, a corporation owned by the Pueblo of Santa Ana, a tribe, recently entered into an NIL partnership with the University of New Mexico. The agreement engaged three Native American Division I student-athletes, each of whom collaborated with the tribal-owned business to create and sell personalized merchandise.[17]

452.    Florida State University also has a partnership with the Seminoles, which allows the University to feature the tribe's culture and symbols.[18]

453.     Further, Part 123.4(b) identifies and supports the existence of such a market by

---

[17] https://golobos.com/news/2023/02/17/new-mexico-tribal-owned-business-partners-with-unm-for-s-a-nil-agreements
[18] https://www.fsu.edu/seminole-tribe/know.html

explicitly providing an exception for school districts and tribal nations to contract before Part 123's effective date. And the very existence of the MSD-NAGA Agreement, as well as tribal agreements by other school districts under Part 123, provides clear evidence of a competitive market.

454.    The Rule is not justified by a valid factor unrelated to economic protectionism. There is no evidence of any DASA violations in the District linked to Indigenous names or imagery, undercutting Defendants' asserted justification.

455.    Even assuming an anti-discrimination factor, Part 123 arbitrarily distinguishes between in-state and out-of-state tribes. If Indigenous names and imagery are inherently harmful, that harm does not vary based on the geographic location of the tribe granting permission to use such imagery. Allowing only New York-based or recognized tribes to contract with schools, while barring out-of-state tribes, serves no legitimate local interest. The burden— categorically stripping all non-New York tribes of their contractual rights—is "clearly excessive in relation to the putative local benefit."

456.    Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability based on breach of contract claims, Title VI claims, and Title VII claims.

457.    Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

458.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of the Dormant Commerce Clause.

459.    Accordingly, Part 123 violates the Dormant Commerce Clause and must be

82

declared unconstitutional.

460.    Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted, and to a permanent injunction barring its enforcement against them.

## AS AND FOR A SEVENTH CAUSE OF ACTION BY THE DISTRICT AND BOARD AGAINST ALL DEFENDANTS
### (Part 123 Violates the Indian Commerce Clause)

461.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

462.    Part 123 is unconstitutional because it is preempted by the Indian Commerce Clause (U.S. Const. art. I, § 8, cl. 3).

463.    "The Indian Commerce Clause grants the United States Congress the power 'to regulate commerce ... with the Indian tribes.'" *New York v. Mt. Tobacco Co.*, 942 F.3d 536, 544 (2d Cir. 2019) (citing U.S. Const. art. I, § 8, cl. 3).

464.    That power extends beyond mere trade to the broader domain of "Indian affairs," including the regulation of tribal sovereign rights. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980) ("Congress has broad power to regulate tribal affairs."); *Haaland v. Brackeen*, 599 U.S. 255, 278 (2023) ("As we already explained, our precedent states that Congress's power under the Indian Commerce Clause encompasses not only trade but also 'Indian affairs.'") (citations omitted); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1983) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.") (citation omitted).

465.    Tribal affairs are implicated when a state attempts to regulate "activity undertaken . . . by tribal members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S. Ct.

2578, 65 L. Ed. 2d 665 (1980).

466.   Courts have observed "that only *Congress*—not the states—may act to diminish tribal sovereignty." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 557-558 (7th Cir. 2022) (citing *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S. Ct. 2024, 2030, 188 L. Ed. 2d 1071 (2014).

467.   The U.S. Supreme Court has further emphasized, "While under the Interstate Commerce Clause, States retain 'some authority' over trade, we have explained that 'virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government.'" *Haaland v. Brackeen*, 599 U.S. 255, 273 (2023) (citing *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 62, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996)).

468.   This exclusive federal regulatory domain is reinforced by the "trust relationship" between the United States and Indian tribes. *United States* v. *Mitchell*, 463 U. S. 206, 225-226, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983). The Federal Government owes Indian tribes "moral obligations of the highest responsibility and trust," *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 176, 131 S. Ct. 2313, 180 L. Ed. 2d 187 (2011).

469.   In evaluating preemption in this context, "[r]elevant federal statutes and treaties must be examined in light of 'the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.'" *Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 838 (1982) (citations omitted); *id.* ("ambiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity.").

470.   By denying tribal nations the ability to contract with public schools for NIL, imposing rigid temporal cut-offs, and disallowing any "money, consideration, or thing of value"

84

in NIL contracts with tribal nations, Part 123 directly prohibits certain commerce with Indian tribes, infringes upon the sovereignty of tribal nations, and impermissibly regulates in Congress's exclusive domain of tribal affairs.

471.    Because federal law preempts any state regulation that intrudes on tribal affairs and commerce, Part 123 is both field-preempted (Congress occupies the field of Indian-tribal relations) and conflict-preempted (Part 123 frustrates federal objectives).

472.    Part 123 also infringes Congress's "trust responsibility" to protect Indigenous peoples. As detailed above, Part 123 violates Title VI, Title VII, the Due Process Clause, and Section 1981 by discriminating against Indigenous groups and individuals. Taken together with the federal government's unique fiduciary obligations under the Indian Commerce Clause and the trust relationship, this body of federal law preempts Part 123's discriminatory regime.

473.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, any state regulation that conflicts with or obstructs Congress's Indian Commerce power and its attendant trust responsibilities is preempted.

474.    Part 123 violates the Indian Commerce Clause and must be declared unconstitutional and preempted.

475.    Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by the Indian Commerce Clause, and to a permanent injunction barring its enforcement against them.

<div align="center"><b>PRAYER FOR RELIEF</b></div>

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment:

a.  Declaring that Part 123 conflicts with governing law and is therefore null and void;

b.  Enjoining Defendants from enforcing Part 123; and

<div align="center">85</div>

c.  Awarding Plaintiffs such other and further relief as this Court may deem just, equitable, and proper.

Dated:  Melville, New York
        October 15, 2025

<div style="text-align:right">

Respectfully submitted,

**RIGANO LLC**

By: */s/ Nicholas C. Rigano*
    Nicholas C. Rigano, Esq.
    Laurie Sayevich Horz, Esq. (Of Counsel)
    538 Broad Hollow Road, Suite 301
    Melville, New York 11747
    Telephone No. (631) 756-5900
    nrigano@riganollc.com

  HOLTZMAN VOGEL BARAN
  TORCHINSKY & JOSEFIAK PLLC

By: */s/ Oliver Roberts*
    Oliver Roberts, Esq.
    2300 N Street, NW, Suite 643
    Washington DC 20037

*Attorneys for Plaintiffs*

</div>